217 P.3d 291 (2009)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Bradley R. MARSHALL, Attorney at Law.
No. 200,577-2.
Supreme Court of Washington, En Banc.
Argued May 14, 2009.
Decided October 1, 2009.
*294 Bradley Rowland Marshall, Seattle, for Petitioner/Appellant.
Scott G. Busby, Seattle, for Appellee/Respondent.
J.M. JOHNSON, J.
¶ 1 In 2006, the Washington State Bar Association (WSBA) charged Bradley R. Marshall with 12 counts of violating the Rules of Professional Conduct. Mr. Marshall has been the subject of three prior disciplinary actions. In the present disciplinary action, the hearing officer made over 175 findings of fact in addition to conclusions of law relating to each charged count of misconduct. The hearing officer recommended that Mr. Marshall be disbarred, and the Disciplinary Board (Board) unanimously agreed.
¶ 2 We have elected to follow the recommendation of the unanimous Board and disbar Mr. Marshall. Mr. Marshall committed a number of different violations, which individually would have warranted disbarment. These violations include demands for additional fees to continue a lawsuit that was paid for on a flat fee basis, filing a lawsuit and a lien against a client who refused to pay him additional fees, a deceptive attempt to compel settlement, failure to obtain consent for a conflict of client interest, and other deceptive practices. These facts are accompanied by multiple aggravating factors, including prior discipline for similar conduct. Taking these violations together, Mr. Marshall fails to present us with a reason to depart from the recommendation of the hearing officer and Board.

FACTS[1]
¶ 3 Beginning in October of 2000, Mr. Marshall agreed to represent Callie Rheubottom and Essie Wormack in bringing a lawsuit against the Prince Hall Grand Chapter Order of the Eastern Star (Grand Chapter). Mrs. Rheubottom and Mrs. Wormack were former members of the Grand Chapter.

Flat Fee Agreements and Conflict of Interest
¶ 4 On October 4, 2000, Mr. Marshall sent written fee agreements to Mrs. Rheubottom and Mrs. Wormack. The agreement was for joint representation for a flat "non-refundable fee" of $15,000. Ex. 3. The purpose of the arrangement was "to pursue a claim for breach of contract, tortuous conduct and related claims" against the Grand Chapter and Patricia Simpson, one of the officers of the Grand Chapter.[2]Id. On January 9, 2001, Mr. Marshall filed a lawsuit against the Grand Chapter and Patricia Simpson on behalf of Mrs. Rheubottom and Mrs. Wormack (the Rheubottom litigation).
¶ 5 In February of 2001, Mr. Marshall agreed to represent Lorraine Harris, another former member of the Grand Chapter. He joined her as a plaintiff in the Rheubottom litigation via amended complaint. Mrs. Harris paid Mr. Marshall a $7,500 flat fee for representing her. However, Mrs. Wormack had previously objected both orally and in *295 writing to adding Mrs. Harris in the Rheubottom litigation because Mrs. Harris had different goals in suing the Grand Chapter. Mr. Marshall did not advise any client in writing about the conflict or obtain a written waiver.
¶ 6 On May 8, 2001, the Grand Chapter filed an answer and included counterclaims against all three plaintiffs. Additionally, the Grand Chapter filed a third party complaint against Lindia Richard[3], William Rheubottom (Callie Rheubottom's husband) and Bert Harris (Lorraine Harris' husband). These third parties were all former members of the Grand Chapter.
¶ 7 The Grand Chapter had also brought a lawsuit against several defendants, including each of the above mentioned parties (the Grand Chapter litigation).[4] In May of 2001, Mr. Marshall agreed to represent Mr. Rheubottom and Mr. Harris in the Rheubottom litigation and the Grand Chapter litigation, receiving a flat fee payment from both men totaling $19,000. Mr. Marshall did not obtain consent in writing from any of his clients concerning the potential conflict of interest. On May 29, 2001, Mr. Marshall filed an answer on behalf of each of his clients to the counterclaims and third party complaint in the Rheubottom litigation. All relevant lawsuits were consolidated as of December 2001 (consolidated litigation).

Settlement Negotiations and Additional Fee Demands
¶ 8 In April 2002, Mr. Marshall negotiated a settlement on behalf of Mrs. Rheubottom, Mrs. Wormack, and Mrs. Harris as to the two individual defendants named in the consolidated litigation. Mrs. Rheubottom, Mrs. Wormack, and Mrs. Harris each were to be paid $12,500. The money was paid and deposited into Mr. Marshall's trust account. The settlement did not include the third defendant, the Grand Chapter.
¶ 9 On June 3, 2002, at a mediation proceeding, the Grand Chapter attempted to reach a settlement resolving all pending claims in the consolidated litigation. As a result of the mediation, counsel for the Grand Chapter, Mr. Marshall, the mediation judge, and some, if not all, of the clients thought settlement had been reached. However, no written settlement agreement was signed by any of the clients, no written stipulation was executed, and shortly after the mediation, all clients confirmed to Mr. Marshall that they had not agreed to a settlement.
¶ 10 With the earlier settlement proceeds still in his trust account, Mr. Marshall informed each of the clients that they would have to pay him additional fees if they wanted to continue to pursue their claims against the Grand Chapter.[5] Mr. and Mrs. Rheubottom paid Mr. Marshall $15,000 in additional fees for his continued representation. Mrs. Wormack and Mrs. Harris refused to pay additional fees, arguing their agreement was for a flat fee that they had already paid.[6]
¶ 11 By letter dated June 17, 2002, Mr. Marshall attempted to get Mrs. Wormack and Mrs. Harris to settle with the Grand Chapter. Ex. 42. Referring to the settlement negotiations, he wrote, "The court has directed Ms. Wormack and Ms. Harris sign the release and settlement agreement and the [Grand] Chapter to do the same in order to consummate this matter." Id. Mr. Marshall enclosed the release documents for signature. However, the letter statement was not true; the court had not directed Mrs. *296 Wormack or Mrs. Harris to sign the release and settlement agreement.
¶ 12 Mrs. Wormack did not sign the release and indicated by letter on June 25, 2002, that she had not agreed to settle her case against the Grand Chapter. Noting her desire to proceed to trial and referencing Mr. Marshall's demand for an additional $15,000 from each client, Mrs. Wormack further stated that she felt that Mr. Marshall was "threatening Ms. Harris and I, but I will have my day in court." Ex. 43.
¶ 13 On July 8, 2002, Mr. Marshall sent the settlement agreement to Mr. and Mrs. Harris and requested they sign and return the document as soon as possible. They did not do so. On July 23, 2002, Mrs. Harris wrote Mr. Marshall, indicating she felt she was being threatened and asking how Mr. Marshall could "demand my signature on a document which is not truthful." She further stated, "I totally disagree with you [sic] hearing and finalization of this case." Answering Br. of WSBA, App. A at 22 (Am. Findings of Fact, Conclusions of Law, and Hearing Officer's Recommendation (AFFCL) 142) (alteration in original).
¶ 14 Mr. Marshall responded in a July 31, 2002 letter that it was his "understanding that you each have settled your case." Ex. 53. He also stated that "[d]espite your reluctance to sign the Settlement Agreement, your claims have been dismissed and will not be heard at trial." Id. However, Mrs. Wormack's and the Harris' claims against the Grand Chapter had not been dismissed as of that date.
¶ 15 In August 2002, the Grand Chapter filed a motion to compel Mrs. Wormack and Mr. and Mrs. Harris to execute a settlement agreement with the Grand Chapter.[7] Mr. Marshall did not oppose the motion, although he had opposed a similar motion filed against those clients that agreed to pay additional fees. Mrs. Wormack wrote to the court attempting to oppose the motion pro se.
¶ 16 In September 2002, the Grand Chapter nonsuited its claims. On January 17, 2003, Mr. Marshall wrote to Mrs. Harris. He now told her that she remained a plaintiff in the Rheubottom litigation and inquired whether she was interested in pursuing her claims at trial. Mrs. Harris responded three days later via letter indicating she was "still interested in this case to the same extent that I shared with you in previous conversations," but indicated that her "husband's heath will not allow me to make any effort to pay additional funds to you." Ex. 68. In response, Mr. Marshall wrote Mrs. Harris on January 21, 2003, that "[i]n order for me to proceed to trial on your behalf, you will need to forward a check to me in the amount of $15,000.00 by Thursday, January 23, 2003." Ex. 69. Although Mr. Marshall claimed this payment was for costs, his costs after January 21, 2003, through the completion of trial totaled $53.92.[8] Mrs. Harris did not pay Mr. Marshall any additional fees.

Mrs. Richard's Fee Agreement
¶ 17 During this time, Mr. Marshall was also billing Mrs. Richard on an hourly basis. She initially paid him $1,000 on June 13, 2002. Ex.40. The hearing officer found this payment to be an advance fee deposit. Mr. Marshall did not deposit the $1,000, or any portion thereof, to his client trust account.[9] Over the next few months, Mr. Marshall issued four additional invoices to Mrs. Richard. On January 16, 2003, Mrs. Richard and *297 her husband met with Mr. Marshall and discussed his legal fees. On that date Mrs. Richard had paid all invoices from Mr. Marshall in full. Mr. Marshall agreed to complete the representation of Mrs. Richard for a flat fee of an additional $5,000. He also agreed to prepare an amended fee agreement. However, he never prepared the amended fee agreement.
¶ 18 On January 27, 2003, Mrs. Richard sent a $5,000 cashier's check to Mr. Marshall's office. Along with the payment, Mrs. Richard included a handwritten note indicating it was "for Retainer completing the PHGC case. Per your agreement on 1/16/03." Ex. 70. The check was deposited in the client trust account.
¶ 19 In March 2003, Mr. Marshall represented Mrs. Rheubottom and Mrs. Richard at the trial in the Rheubottom lawsuit. He did not represent Mrs. Wormack or Mrs. Harris, who still declined to pay his additional fees. The jury awarded $3,500 each to Mrs. Rheubottom and Mrs. Richard.
¶ 20 Although Mr. Marshall had agreed to represent Mrs. Richard for the $5,000.00 flat fee, he sent Mrs. Richard an invoice dated April 1, 2003, charging her $21,787.50 for professional legal services between March 10, 2003 and March 29, 2003. Ex. 74. Through a different attorney, Mrs. Richard challenged the invoice by stating her position that the $5,000.00 payment in January constituted full payment of Mr. Marshall's fees. Ex. 75. Mr. Marshall filed an attorney's lien for $21,787.50. Ex. 76. Two days after that, he filed a lawsuit against Mrs. Richard for $21,787.50 in fees. Ex. 77. Later that month, he removed Mrs. Richard's $5,000.00 payment from his trust account. AFFCL 76. Finally, in August 2004, after Mrs. Richard filed a grievance against him, Mr. Marshall dropped his lawsuit against Mrs. Richard. AFFCL 77.

PROCEDURAL HISTORY
¶ 21 On May 20, 2003, Mrs. Richard filed a grievance against Mr. Marshall.[10] Nearly two years later, the WSBA filed a formal complaint against Mr. Marshall charging him with 12 counts of violating the RPCs.[11] In total, the WSBA alleged Mr. Marshall violated nine different rules of professional conduct, including multiple violations of some of those rules.[12]
¶ 22 Teena Killian was appointed hearing officer. On May 25, 2006, the WSBA announced it was accepting applications for the position of disciplinary counsel. On June 1, 2006, after a new scheduling order was agreed upon, disciplinary counsel Christine Gray learned that Ms. Killian had applied for the disciplinary counsel position. She telephoned Mr. Marshall's counsel, Mr. Bulmer, and informed him that she would join in a request that Ms. Killian recuse herself. On June 22, 2006, the parties moved jointly for Ms. Killian's recusal and Ms. Killian recused. Mr. Marshall sought to have orders entered by Ms. Killian vacated. The WSBA agreed and the orders were vacated.
¶ 23 On August 10, 2006, chief hearing officer James M. Danielson appointed himself hearing officer. He did so after two other hearing officers were removed after challenges. All subsequent rulings were made by Mr. Danielson. Mr. Marshall never sought to disqualify Mr. Danielson until after Mr. Danielson announced his recommendation against Mr. Marshall.
¶ 24 After a disciplinary hearing on February 20-27, 2007,[13] the hearing officer issued findings of fact and conclusions of law. The hearing officer found Mr. Marshall had violated *298 the RPCs in 9 of the 12 counts, while dismissing counts 6, 7, and 12. The hearing officer recommended that Mr. Marshall be disbarred.
¶ 25 On May 10, 2007, this court issued its decision in Marshall's other disciplinary action. In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 157 P.3d 859 (2007). The Board entered an order modifying three findings of fact. In all other respects, the hearing officer's findings of fact and conclusions of law were affirmed. The Board unanimously recommended that Mr. Marshall be disbarred.

ANALYSIS
¶ 26 Mr. Marshall assigns error to 65 of the hearing officer's findings. He also assigns error to 10 of the hearing officer's conclusions of law, as well as the recommended sanction of disbarment. He disputes any finding in which the hearing officer found he acted knowingly or that his testimony was not credible. Additionally, he argues his due process rights were violated.
¶ 27 We outlined the standard of review in Mr. Marshall's previous disciplinary action before this court. Id. at 329-30, 157 P.3d 859. The ultimate responsibility for lawyer discipline in Washington rests with this court. Id. at 329, 157 P.3d 859 (citing In re Disciplinary Proceeding Against Cohen, 150 Wash.2d 744, 753-54, 82 P.3d 224 (2004) (Cohen II)). Nevertheless, "we give considerable weight to the hearing officer's findings of fact." Id. at 329-30, 157 P.3d 859. "Unchallenged findings of fact are treated as verities on appeal." Id. at 330, 157 P.3d 859 (citing In re Disciplinary Proceeding Against Longacre, 155 Wash.2d 723, 735, 122 P.3d 710 (2005)). Where, as here, findings of fact are challenged, we will uphold the hearing officer's findings if they are supported by substantial evidence. Id. (citing In re Disciplinary Proceeding Against Poole, 156 Wash.2d 196, 208, 125 P.3d 954 (2006)).
¶ 28 When an attorney challenges findings of fact, he must present argument as to why specific findings are unsupported and cite to the record to support the argument. Id. at 331, 157 P.3d 859 (citing In re Disciplinary Proceeding Against Kronenberg, 155 Wash.2d 184, 191, 117 P.3d 1134 (2005)). It is not sufficient for the attorney to merely argue his version of the facts while ignoring the testimony of other witnesses. Id. We will give great weight to the hearing officer's evaluation of the credibility and truthfulness of the witnesses. Id. at 330, 157 P.3d 859. And we will not overturn findings of fact based merely on alternative explanations or versions of the facts rejected by the hearing officer and board. Id. at 331, 157 P.3d 859 (citing Poole, 156 Wash.2d at 212, 125 P.3d 954).
¶ 29 We review each of Mr. Marshall's challenges to the hearing officer's conclusions of law de novo and will uphold them if they are supported by the findings of fact. Id. The WSBA must prove misconduct by a clear preponderance of the evidence. Id. at 330, 157 P.3d 859. We generally uphold the hearing officer's ultimate conclusion relating to any misconduct "if it is supported by substantial evidence in the record that the lower court could reasonably have found would meet the clear preponderance standard." Id. We reserve the right to determine how much weight to give the hearing officer's findings in arriving at the presumptive sanction. In re Disciplinary Proceeding Against Eugster, 166 Wash.2d 293, 320, 209 P.3d 435 (2009). The clear preponderance standard requires more proof than simple preponderance, but less than beyond a reasonable doubt. Marshall, 160 Wash.2d at 330, 157 P.3d 859 (citing Poole, 156 Wash.2d at 209, 125 P.3d 954). "Substantial evidence is evidence sufficient `to persuade a fair-minded, rational person of the truth of a declared premise.'" Id. (internal quotation marks omitted) (quoting Poole, 156 Wash.2d at 209 n. 2, 125 P.3d 954). Our substantial evidence review takes into account the clear preponderance burden of proof. Id.

A. Due Process Arguments

¶ 30 Mr. Marshall initially requests that his case be dismissed or that he receive a new hearing based on two due process arguments. First, he complains that he did not receive a fair hearing based on alleged bias on the part of the hearing officer. Second, *299 he argues that the amended complaint did not put him on notice as to the specific conflict of interest violations he would have to defend against. Both claims are without merit.

1. Hearing Officer

¶ 31 Mr. Marshall contends that his due process rights were violated when chief hearing officer James Danielson appointed himself hearing officer. He cites the Code of Judicial Conduct (CJC) arguing "[j]udges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned...." CJC Canon 3(D)(1).
¶ 32 Mr. Marshall bases his argument primarily on ELC 2.6, "Hearing Officer Conduct." He admits that ELC 2.5(f) contemplates that the chief hearing officer (CHO) may act as a hearing officer in disciplinary proceedings. However, he argues the rule is not intended to allow the CHO to do so when it will create a clear question of his impartiality and the fairness of the proceedings. ELC 2.6(e)(4)(A).
¶ 33 Mr. Marshall has three complaints regarding Mr. Danielson. First, he argues Mr. Danielson knew that the first hearing officer, Ms. Killian, had applied for a job with the WSBA. Second, he argues Mr. Danielson received an annual salary from the WSBA and participated in WSBA committees. Third, he argues Mr. Danielson showed bias by refusing some of Mr. Marshall's requests for discovery and testimony. Mr. Marshall believes these considerations require that the charges against him be dismissed or that he receive a new hearing. Neither course of action is necessary here.
¶ 34 Mr. Marshall's complaint concerning Ms. Killian is unfounded. Once the disciplinary counsel discovered Ms. Killian had applied for a position with the WSBA, she informed Mr. Marshall and suggested recusal. All rulings made by Ms. Killian were vacated. Any potential harm caused by the conflict of interest was remedied by the recusal. Mr. Danielson's failure to inform Mr. Marshall of Ms. Killian's job application, assuming he even knew, did not disqualify him as a hearing officer.
¶ 35 Mr. Marshall's argument that Mr. Danielson's involvement with the WSBA created an appearance of fairness problem is also insupportable. After Ms. Killian recused, Mr. Danielson appointed two other hearing officers but each was disqualified. Only then did Mr. Danielson appoint himself. Mr. Marshall argues that doing so was inappropriate due to Mr. Danielson's annual salary from the WSBA and his participation in WSBA committees.
¶ 36 Mr. Danielson's salary does not bias him any more than the salary paid to any judge that hears cases brought by the State of Washington. Additionally, Mr. Danielson's involvement and discussions relating to improving hearing officer performance does not show bias or the appearance of unfairness. ELC 2.6(e)(4) provides a nonexclusive list of examples in which a hearing officer should be disqualified.[14] The facts surrounding Mr. Danielson's involvement in Mr. Marshall's disciplinary proceeding do not rise to the level requiring recusal.
¶ 37 Finally, Mr. Marshall fails to make a compelling argument that any of Mr. Danielson's adverse rulings were the result of bias or prejudice. We hold there is no cause to dismiss or remand for a new hearing.

2. Amended Complaint

¶ 38 Mr. Marshall claims the amended formal complaint was insufficient in regard to the conflict of interest charge. He argues it *300 failed to inform him of the nature of the misconduct charged and did not allow him to prepare a defense.
¶ 39 As we noted in his previous disciplinary action, ELC 10.3(a)(3) states: "`[t]he formal complaint must state the respondent's acts or omissions in sufficient detail to inform the respondent of the nature of the allegations of misconduct.'" Marshall, 160 Wash.2d at 340, 157 P.3d 859 (alteration in original). In attorney discipline cases, due process requires that Mr. Marshall "`be notified of clear and specific charges and ... be afforded an opportunity to anticipate, prepare, and present a defense.'" Id. (alteration in original) (quoting In re Disciplinary Proceeding Against Romero, 152 Wash.2d 124, 136-37, 94 P.3d 939 (2004)).
¶ 40 Specifically, Mr. Marshall takes issue with the hearing officer's finding of fact 21(c).[15] He complains the amended complaint did not put him on notice to defend himself against the specific findings ultimately made by the hearing officer.
¶ 41 Mr. Marshall was properly notified of the charges against him regarding conflict of interest violations. In its first amended formal complaint, the WSBA alleged "Mrs. Wormack objected to having Mrs. Harris join the Rheubottom litigation" and Mr. Marshall "knew that Mrs. Wormack objected to having Mrs. Harris join the Rheubottom litigation." Ex. 119, at 2. The WSBA also alleged Mr. Marshall failed to explain the implications and risks of common representation and that he failed to obtain consent in writing from his clients. Id. at 3. Further, the WSBA specifically charged Mr. Marshall, on account of these actions, of violating former RPC 1.7(b). Id. Mr. Marshall had every opportunity to anticipate, prepare, and present a defense. He was afforded due process. Accordingly, we deny Mr. Marshall's motion for dismissal or a new hearing as he has failed to show any due process violations.

B. Findings of Fact

¶ 42 We next determine whether the hearing officer's findings of fact are supported by substantial evidence. Mr. Marshall makes numerous objections to the findings of fact. None of his claims show the clear preponderance standard was not met. In the end, many of the findings of fact are the result of a credibility determination by the hearing officer. Considering we give great weight to the hearing officer's evaluation of the credibility and veracity of the witnesses he observes first hand, there is not enough evidence to overturn the hearing officer.
¶ 43 Mr. Marshall's dispute with the hearing officer's findings of fact can be categorized into three general topics: fees, settlement, and conflict of interest.

1. Fees

¶ 44 There are three separate fee agreements at issue. The first is Mr. Marshall's flat fee agreement with Mrs. Wormack and Mrs. Rheubottom. The second is the flat fee agreement with Mrs. Harris. These two agreements and the accompanying facts can be analyzed together as they are substantially similar. The third agreement is between Mr. Marshall and Mrs. Richard and was hourly.

a. Wormack/Rheubottom Fee Agreement and Harris Agreement
¶ 45 On October 4, 2000, Mr. Marshall entered into a fee agreement with Mrs. Wormack and Mrs. Rheubottom. The agreement had three relevant components. First, the clients were required to pay all reasonable costs, which could be advanced by Mr. Marshall, requiring reimbursement by the clients. Second, the clients would be required to pay "a $15,000 nonrefundable fee." Third, Mr. Marshall would "make no further charge for [his] services other than as set forth in this agreement or unless otherwise agreed." Ex. 3.
*301 ¶ 46 Mrs. Rheubottom and Mrs. Wormack paid Mr. Marshall the full $15,000.[16] The fee agreement with Mrs. Harris was substantially similar, with a charge of $7,500. Mrs. Harris paid the $7,500. Ex. 9.
¶ 47 In June 2002, Mr. Marshall was holding $12,500 for each of his clients involved in the first settlement with the named defendants. After the subsequent settlement conference with the Grand Chapter on June 3, 2002, Mr. Marshall informed Mrs. Rheubottom, Mrs. Harris, and Mrs. Wormack that they would have to pay additional fees for him to continue the case.
¶ 48 In his initial answer to the WSBA's amended formal complaint, Mr. Marshall admitted that he told Mrs. Rheubottom, Mrs. Wormack, and Mrs. Harris they would have to pay him additional fees. Ex. 120.[17] He now contends that he was not asking for fees, but costs.
¶ 49 There is nothing in the record to indicate Mr. Marshall was attempting to collect this money for costs. First, nothing in the agreements provided for a cost advance by the clients. Instead, the agreement specifically provided that Mr. Marshall could advance costs to be repaid by the clients. Second, the total costs billed to all of Mr. Marshall's clients after June 5, 2002, which included the trial, was only $4,391.41.[18] If Mr. Marshall is to be believed, he was demanding $30,000.00 for a cost advance from Mrs. Wormack and Mrs. Harris, not including the $15,000.00 he received from Mrs. Rheubottom. Third, Mrs. Wormack's letters to Mr. Marshall indicate she believed he was demanding an additional fee to finish the work he had already agreed to do under the flat fee agreement. See Exs. 43 & 51.
¶ 50 Once Mrs. Wormack and Mrs. Harris declined to pay him more fees, Mr. Marshall attempted to coerce them into a settlement. Mrs. Wormack was forced to represent herself when the Grand Chapter filed a motion to compel settlement. However, Mr. Marshall defended the other two clients who had paid additional fees. Mr. Marshall was willing to represent Mrs. Wormack and Mrs. Harris at trial only if they paid him an additional $15,000.
¶ 51 Mr. Marshall presents no compelling reason to depart from the hearing officer's finding that he was requesting additional fees rather than costs. Once Mr. Marshall asked for additional fees and did not receive them, his representation of Mrs. Wormack and Mrs. Harris stopped.[19] The hearing officer's findings of fact in relation to Mr. Marshall's demands for additional fees are supported by substantial evidence.

b. Mrs. Richard Fee Agreement
¶ 52 Unlike Mr. Marshall's other clients, Mrs. Richard was billed on an hourly basis. Mrs. Richard paid an initial retainer of $1,000 and was billed at an hourly rate of $175 per hour. Mrs. Richard had paid all of her invoices as of January 16, 2003. Mrs. Richard testified that on January 16, 2003, prior to trial, she met in Mr. Marshall's office and agreed to pay him a "flat fee" of $5,000 to "finish the case." 2 Tr. (Feb. 21, 2007) at 286-92. Mr. Richard, who was waiting outside when this agreement was reached, also testified that he subsequently asked Mr. Marshall why they needed to pay an additional $5,000 and Mr. Marshall responded it was to finish the case. 2 Tr. (Feb. 21, 2007) at 337. Mrs. Richard sent Mr. Marshall a $5,000 cashier's check with an accompanying handwritten note. The note stated that the check was "for retainer completing the PHGC case." Ex. 70. Likewise, the receipt Mrs. Richard received from Mr. Marshall *302 said "non-refundable retainer." Ex. 71. However, after the trial, Mr. Marshall billed Mrs. Richard an additional $21,787.50. When she refused to pay he filed a lawsuit and lien against her.
¶ 53 Mr. Marshall refers to his own testimony that the $5,000 payment was not to finish the case. He claims there is no evidence that he ever saw the note accompanying the $5,000 indicating it was to complete the PHGC case. However, he testified at the hearing that "[i]t would generally be the practice for my office to give me a copy of that." 3 Tr. (Feb. 22, 2007) at 593.
¶ 54 The handwritten note indicating the $5,000 check was for the purpose of completing the case supports the testimony of Mr. and Mrs. Richard. The hearing officer found Mr. Marshall's testimony to be not credible. Accordingly, the hearing officer's findings of fact in regard to the $5,000 fee are supported by substantial evidence.

2. Settlement

¶ 55 On June 3, 2002, Judge Michael Heavey held a settlement conference involving Mr. Marshall's clients and the Grand Chapter. At some point during or after the conference, Mrs. Wormack and Mrs. Harris signed two handwritten documents. The first document indicated Mrs. Wormack and Mrs. Harris apologized "for any acts that were perceived to be a violation of the Bylaws and Constitution of the [Grand Chapter]." Ex. 242. The document also stated, "We hope that the process of healing will begin now." Id. The other document signed by Mrs. Wormack and Mrs. Harris noted "[i]t is time now to lay this matter to rest and reconcile our differences." Id.
¶ 56 The facts appear to indicate that most, if not all, of those present believed some settlement was intended. The hearing officer so found. However, there is no dispute that a written settlement agreement was never signed by any of the clients and no written stipulation was executed. At some point after the settlement conference, Mrs. Wormack and Mrs. Harris decided they would not agree to settle, which each confirmed by letter. See Exs. 43, 51.
¶ 57 On June 17, 2002, Mr. Marshall wrote a letter to his four clients that participated in the settlement conference: Mrs. Wormack, Mrs. Harris, Mrs. Rheubottom, and Mrs. Richard. The letter stated in part:
The court has directed Ms. Wormack and Ms. Harris sign the release and settlement agreement and the Chapter to do the same in order to consummate this matter. If the parties do not sign then the Chapter will have the right to bring a motion to enforce these documents and ask for attorney's fees and costs. Given that Judge Heavey has confirmed that the settlement was consummated, Judge Katherine Shaffer may well impose attorney's fees against Ms. Wormack and Ms. Harris if the aforementioned documents are not executed.
Ex. 42. By July 23, 2002, both Mrs. Wormack and Mrs. Harris had refused to sign the agreement and indicated, unequivocally, they were not interested in the settlement. On July 31, 2002, Mr. Marshall wrote Mrs. Wormack and Mrs. Harris a letter indicating it was his understanding that they had settled and concluded his letter: "Despite your reluctance to sign the Settlement Agreement, your claims have been dismissed and will not be heard at trial." Ex. 53.
¶ 58 The Grand Chapter's counsel, Terry Thomson, filed a motion to compel Mrs. Wormack and Mrs. Harris to execute the settlement agreement. Mr. Marshall wrote the two women and indicated he would not oppose the motion. This letter was written on August 15, 2002, after Mr. Marshall had received letters from both Mrs. Wormack and Mrs. Harris informing him that they did not wish to settle.[20] Ex.56.
¶ 59 The evidence shows Mr. Marshall attempted to deceive Mrs. Wormack and Mrs. Harris in order to get them to settle their claims against the Grand Chapter. As part of the disciplinary proceeding *303 against Mr. Marshall, Mr. Thomson testified that the court never directed Mrs. Wormack, Mrs. Harris, the Grand Chapter, or any of the parties to sign a settlement agreement. He also testified that Mrs. Wormack's and Mrs. Harris's claims had not been dismissed. The claims were still pending when the case went to trial the following year. No order of dismissal appears on the docket. Additionally, Mrs. Wormack testified that the court never directed her to sign a settlement agreement.
¶ 60 Mr. Marshall attempts to excuse his actions primarily as inartful drafting.[21] Br. of Appellant at 21. He claims Judge Heavey met with him and the Rheubottoms sometime after the settlement conference. He claims the judge directed him to have his clients sign the release documents and return them to Mr. Thomson. His only support for this contention is his own testimony. He also cites an e-mail from Judge Heavey to Judge Shaffer. Ex. 84. However, the e-mail supports only the conclusion that the judge believed the case was settled in regard to some of the parties, not that he was ordering the parties to sign anything.[22]
¶ 61 Finally, Mr. Marshall states in his brief that when he "understood that Mrs. Wormack's and Mrs. Harris decided they did not want to settle, he sent them letters to advise them to contact him regarding their right to proceed to trial." Appellant's Br. at 21. The two letters he cites, however, were written in January of 2003, six months later and shortly before trial.
¶ 62 The hearing officer's findings of fact surrounding the settlement conference and Mr. Marshall's attempt to deceive his clients are supported by substantial evidence. Mr. Marshall's letters, written after his clients refused to pay additional fees, were misleading and threatening.[23] Additionally, the testimony of Mrs. Wormack and Mr. Thomson, as well as the letters themselves, supports the findings of fact.

3. Conflict of Interest

¶ 63 The hearing officer found that Mrs. Wormack objected both orally and in writing to Mr. Marshall about Mrs. Harris becoming a party to the Rheubottom litigation. The hearing officer further found that Mr. Marshall knew that this objection created a conflict of interest that would preclude his continuing to represent both, absent a waiver. The hearing officer found this same conflict when Mr. Harris was added to the litigation.[24]
¶ 64 Mr. Marshall contends there was no direct conflict of interest or anything that created a significant risk of materially limiting his representation of any of the clients.[25] He further argues that unless actual conflicts of interest existed, there is no requirement that he obtain consent and written waivers pursuant to former RPC 1.7(b).
¶ 65 Mr. Marshall does not dispute that Mrs. Wormack objected to having Mrs. Harris included or that he failed to obtain a written consent. Mrs. Wormack testified that she had told Mr. Marshall multiple times *304 in writing and orally that she objected to having Mrs. Harris added to the lawsuit because they had "totally different" agendas. Tr. (Feb. 20, 2007) at 145-48, 152. Her letters to Mr. Marshall unequivocally confirm this. See Exs. 10-11.
¶ 66 One letter from Mrs. Wormack to Mr. Marshall is particularly illustrative. On March 3, 2001, she requested to withdraw from the Rheubottom litigation "because of the unethical client lawyer treatment" she received by Mr. Marshall's allowing Mrs. Harris to join the lawsuit against her wishes and not informing her that Mrs. Harris had been joined despite her objections. Ex. 11. She noted that Mrs. Harris had "a severe need to satisfy her vengeance" against a certain member of the Grand Chapter while Mrs. Wormack and Mrs. Rheubottom's interest was only "justice." Id. These facts indicate more than just a potential conflict of interest but an actual conflict, of which Mr. Marshall was fully aware.
¶ 67 Mr. Marshall's reply was that the two women resolved their differences and no other conflict of interest existed. Br. of Appellant at 27. Even if true, he still failed to obtain a written waiver. The hearing officer's finding that a conflict of interest existed is supported by substantial evidence. The hearing officer's finding that Mr. Marshall failed to obtain consent in writing from any of his clients is supported by substantial evidence.

C. Conclusions of Law

¶ 68 The hearing officer issued conclusions of law in regard to each charged count of misconduct. In each of the counts discussed below, the hearing officer found Mr. Marshall acted knowingly and was unimpaired. The hearing officer also found Mr. Marshall's actions caused injury or potential injury. We use the American Bar Association's Standards for Imposing Lawyer Sanctions (1991 ed. & Supp.1992) (ABA Standards) as our guide. A lawyer acts with "knowledge" "`when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result.'" In re Disciplinary Proceeding Against Stansfield, 164 Wash.2d 108, 123, 187 P.3d 254 (2008) (quoting ABA Standards at 6).

1. Count 1Additional Fees

¶ 69 In count 1, the hearing officer concluded that Mr. Marshall violated former RPC 1.5(a), 8.4(a), and 8.4(c) by requesting and/or receiving additional fees from Mrs. Wormack and Mrs. Harris for representation that had already been paid for under a flat fee agreement.
¶ 70 The hearing officer's conclusions of law in regard to count 1 are supported by substantial evidence. Mrs. Wormack and Mrs. Harris agreed to a flat fee for representation. Once Mr. Marshall had the $12,500 settlement checks from the earlier settlement, and once Mrs. Wormack and Mrs. Harris declined to accept the Grand Chapter settlement offer, Mr. Marshall demanded additional fees in order to continue his representation. He did this despite the agreement's terms, which contemplated that the case may go to trial. Additionally, Mrs. Wormack and Mrs. Harris were paying for all costs associated with the litigation and were up to date on all payments. These facts support the conclusion that Mr. Marshall violated former RPC 1.5(a), 8.4(a), and 8.4(c), and did so knowingly.

2. Count 2Conflict of Interest

¶ 71 In count 2, the hearing officer concluded that Mr. Marshall violated former RPC 1.7(b) when he agreed to represent Mrs. Harris over the objection of Mrs. Wormack, and later agreed to represent Mr. Harris without obtaining consent in writing from Mrs. Wormack, Mrs. Harris, and Mr. Harris.[26] Mr. Marshall knew of the conflict of interest from both oral and written communications from Mrs. Wormack.
¶ 72 Under former RPC 1.7(b), representation of multiple clients in a single matter *305 requires that the attorney explain the implications of the common representation and the risks involved. This "rule assumes that multiple representation will necessarily require consultation and consent in writing...." Marshall, 160 Wash.2d at 336, 157 P.3d 859.
¶ 73 The hearing officer's conclusions of law in regard to count 2 are supported by substantial evidence. Mr. Marshall admits that he was aware of a conflict of interest and yet he still agreed with Mrs. Harris to represent her in the Rheubottom litigation. At no point did Mr. Marshall explain the potential problems or obtain a written waiver. These facts support the conclusion that Mr. Marshall violated former RPC 1.7(b).

3. Count 3Misleading Statements to the WSBA

¶ 74 In count 3, the hearing officer concluded that Mr. Marshall violated former RPC 8.4(c), 8.4(d), and 8.4(l) by making a misleading statement to the WSBA that he had not requested attorney fees but only costs from Mrs. Wormack and Mrs. Harris.
¶ 75 The hearing officer's conclusions of law in regard to count 3 are supported by substantial evidence. The facts indicate Mr. Marshall was attempting to get his clients to pay him additional fees, and not costs. The hearing officer made a credibility determination, supported by substantial evidence, that Mr. Marshall knowingly misled the WSBA. These facts support the conclusion that Mr. Marshall violated former RPC 8.4(c), 8.4(d), and 8.4(l).

4. Count 4Richard Fee Agreement

¶ 76 In count 4, the hearing officer concluded Mr. Marshall violated former RPC 1.5(a) when he agreed to complete Mrs. Richard's case for a flat fee, then billed her $21,787.50, and filed a lawsuit against her in an attempt to collect the fee, as well as filing a lien against Mrs. Richard's award in the Rheubottom litigation.
¶ 77 The hearing officer's conclusions of law in regard to count 4 are supported by substantial evidence. The facts supporting the hearing officer's conclusion include testimony of Mr. and Mrs. Richard and the handwritten note accompanying Mrs. Richard's $5,000 check indicating it was to "finish the case." Ex. 71. These facts support the conclusion that Mr. Marshall violated former RPC 1.5(a), and did so knowingly.

5. Count 10Settlement Misrepresentations

¶ 78 In count 10, the hearing officer concluded Mr. Marshall violated former RPC 8.4(c) by making one or more misrepresentations in his letters of June 17, 2002, and July 31, 2002 (trying to compel settlement).
¶ 79 The hearing officer's conclusion of law in regard to count 10 is supported by substantial evidence. Mr. Marshall unequivocally attempted to deceive Mrs. Wormack and Mrs. Harris into believing that they were required to settle their case with the Grand Chapter once they informed Mr. Marshall they would not pay an additional fee. His clients continued to tell him they did not wish to settle. Mr. Marshall defended a motion to compel settlement on behalf of those clients who were willing to pay his additional fee. He declined to do so for the clients who would not. These facts support the conclusion that Mr. Marshall violated former RPC 8.4(c) and did so knowingly.

6. Count 11Settlement

¶ 80 In count 11, the hearing officer concluded Mr. Marshall violated former RPC 1.2(a) by failing to abide by the decision of Mrs. Wormack and Mrs. Harris to not settle their claims against the Grand Chapter and continuing to attempt to force a settlement contrary to his clients' wishes.
¶ 81 For the same reasons discussed in count 10, the hearing officer's conclusions of law in relation to count 11 are supported by substantial evidence.

D. Sanctions

¶ 82 We engage in a two-step process in order to determine the appropriate disciplinary sanctions. In re Disciplinary Proceeding Against Cramer, 165 Wash.2d 323, 339, 198 P.3d 485 (2008) (citing In re Disciplinary Proceeding Against Cohen, *306 149 Wash.2d 323, 338, 67 P.3d 1086 (2003)). To arrive at a presumptive sanction, we must examine the lawyer's conduct as a whole and in context. A single act of misconduct may violate more than one ethical duty. Eugster, 166 Wash.2d at 317, 209 P.3d 435. Using the ABA Standards, we first must determine the presumptive sanction by considering the ethical duty violated, the lawyer's mental state, and the extent of the actual or potential harm caused by the lawyer's misconduct. Id. Second, we consider any aggravating or mitigating facts that alter the presumptive sanction or affect the nature or length of the discipline to be imposed. Id. In order to determine the appropriate sanction, the sanctioning body must take into account all four elementsethical duty violated, lawyer's mental state, extent of actual or potential harm, and aggravating or mitigating factors. Id.

1. Mitigating/Aggravating Factors

¶ 83 The hearing officer found several aggravating factors: multiple disciplinary offenses, selfish motive, pattern of misconduct, deceptive practice, refusal to acknowledge the wrongful nature of conduct, and substantial experience in the practice of law. With the exception of the aggravating factor for refusal to acknowledge the wrongful nature of his conduct, Mr. Marshall makes only passing arguments disputing these aggravating factors.

a. Prior Disciplinary Offenses (ABA Standards std. 9.22(a))
¶ 84 Mr. Marshall does not dispute that he has multiple disciplinary offenses on his record. At the time of the disciplinary proceeding, this court had not yet made a decision in Marshall's earlier disciplinary action. See Marshall, 160 Wash.2d 317, 157 P.3d 859. However, the case was decided by the time the Board reviewed the hearing officer's recommendation. In total, Mr. Marshall has been disciplined on three different occasions including: (1) a 1989 admonition for failing to respond to the WSBA's requests for information; (2) a 1998 reprimand for conduct involving dishonesty, fraud, deceit, or misrepresentation; and (3) a 2007 18 month suspension for (a) "deceitful" conduct; (b) improperly charging contract attorney fees as "costs;" (c) failing to maintain complete records of client funds, failure to provide an appropriate accounting, and failing to remit client funds; (d) representing multiple clients without explaining the implications of common representation or obtaining their written consent; and (e) failing to abide by his clients' decisions.
¶ 85 The only mitigating factor found by the hearing officer was that Mr. Marshall's first admonition was in 1989 (remote). However, the hearing officer's finding of prior discipline is supported by substantial evidence.

b. Dishonest or Selfish Motive (ABA Standards std. 9.22(b))
¶ 86 The hearing officer found Mr. Marshall had a selfish motive in demanding additional fees from Mrs. Wormack and Mrs. Harris and in adding separately paying clients to the litigation without obtaining written consent from existing clients. Mr. Marshall counters by asking a rhetorical question of whether gaining clients and charging for services is not a selfish motive. He argues the hearing officer is confusing the business part of practicing law with the term "selfish motive."
¶ 87 However, a lawyer's service to his clients should be mutually beneficial. Mr. Marshall accepted Mrs. Harris as a client despite Mrs. Wormack's objection. He also entered into a valid fee agreement with Mrs. Wormack and Mrs. Harris and then demanded that they pay him additional funds. Mr. Marshall's reasons for adding Mrs. Harris and charging his clients additional fees were for his own benefit, not for the benefit of his clients. The hearing officer's finding of selfish motive is supported by substantial evidence.

c. Pattern of Misconduct (ABA Standards std. 9.22(c))
¶ 88 The hearing officer found that Mr. Marshall reflected a pattern of misconduct by failing to respond to the WSBA's requests for information and failing to place *307 funds in trust. Mr. Marshall offers no excuse for his conduct. The facts surrounding these claims were not briefed. In sum, the WSBA had to issue three separate subpoenas duces tecum due to Mr. Marshall's failure to timely and/or fully respond to the WSBA's requests for information. The hearing officer's finding is supported by substantial evidence.

d. Deceptive Practice (ABA Standards std. 9.22(f))
¶ 89 The hearing officer found Mr. Marshall engaged in a deceptive practice by attempting to characterize his requests for additional fees as costs both during deposition and during the disciplinary proceedings. The hearing officer found Mr. Marshall's testimony to not be credible. This finding, coupled with the finding that Mr. Marshall was demanding additional fees and not attempting to cover future costs, supports the hearing officer's finding of a deceptive practice. Therefore, this finding is also supported by substantial evidence.

e. Refusal To Acknowledge Wrongful Nature of Conduct (ABA Standards std. 9.22(g))
¶ 90 We decline to find that this aggravating factor is supported by substantial evidence. Although Mr. Marshall has shown no penitence for his actions, we do not penalize him for making arguments in his defense. Nevertheless, there are more than enough aggravating factors to uphold the Board's unanimous decision.

f. Substantial Experience in the Practice of Law (ABA Standards std. 9.22(i))
¶ 91 Mr. Marshall does not appear to contest the hearing officer's finding that Mr. Marshall has substantial experience in the practice of law, having been admitted and practiced since 1986. We find this aggravating factor is supported by substantial evidence.

2. Recommended Sanctions

¶ 92 Count 1: Mr. Marshall knowingly violated former RPC 1.5(a), 8.4(a), and 8.4(c) when he requested additional fees from Mrs. Wormack and Mrs. Harris for representation that had already been paid for under a flat fee agreement. The hearing officer noted Mr. Marshall's actions caused potential serious injury as to the loss of Mrs. Wormack and Mrs. Harris' legal claim. Additionally, the clients were actually injured by the fees they had paid to that point.
¶ 93 The hearing officer correctly applied ABA Standards std. 7.1. This standard provides:
Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and cause[s] serious or potentially serious injury to a client, the public, or the legal system.
¶ 94 Taking into account the aggravating and mitigating circumstances, the hearing officer found no reason to depart from the presumptive sanction of disbarment. The Board unanimously agreed. We find no reason to depart from the recommendation.
¶ 95 Count 2: Mr. Marshall knowingly violated former RPC 1.7(b) by agreeing to represent Mrs. Harris over the objection of Mrs. Wormack, and later agreeing to represent Mr. Harris without obtaining consent in writing. Mr. Marshall knew a conflict of interest existed and failed to obtain a waiver or explain the implications of common representation. Despite Mrs. Wormack's objection, Mr. Marshall added Mrs. Harris to the lawsuit for his own benefit. The hearing officer found this caused actual serious injury due to the lost fees they paid without written consent. Additionally, by having two clients with different agendas, there was the potential for injury in regard to settlement decisions and the focus of the litigation.
¶ 96 The hearing officer correctly applied ABA Standards std. 4.31(b). This standard provides:
Disbarment is generally appropriate when a lawyer, without the informed consent of the client(s):
....

*308 (b) simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.
¶ 97 Taking into account the aggravating and mitigating circumstances, the hearing officer found no reason to depart from the presumptive sanction of disbarment. The Board unanimously agreed. We find no reason to depart from the recommendation.
¶ 98 Count 3: Mr. Marshall knowingly violated former RPC 8.4(c), 8.4(d), and 8.4(l) by making a misleading statement in his investigative deposition that he was not requesting attorney fees, but only costs from Mrs. Wormack and Mrs. Harris. The hearing officer found this caused injury or potential injury to Mr. Marshall's clients, the public, and the legal system.
¶ 99 The hearing officer correctly applied ABA Standards std. 7.2. This standard provides:
Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.
¶ 100 However, taking into account the aggravating and mitigating circumstances, including prior discipline for filing forged declarations, the hearing officer concluded that the recommended sanction should be disbarment. The Board unanimously agreed. We find no reason to depart from the recommendation.
¶ 101 Count 4: Mr. Marshall knowingly violated former RPC 1.5(a) by agreeing with Mrs. Richard to finish her case for a flat fee, and then billing her $21,787.50 and filing a lawsuit and a lien against her. The hearing officer found these actions caused actual serious injury to Mrs. Richard, including her need to hire a lawyer to defend herself.
¶ 102 The hearing officer correctly applied ABA Standards std. 7.1. This standard provides:
Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and cause[s] serious or potentially serious injury to a client, the public, or the legal system.
¶ 103 Taking into account the aggravating and mitigating circumstances, the hearing officer found no reason to depart from the presumptive sanction and recommended disbarment. The Board unanimously agreed. We find no reason to depart from the recommendation.
¶ 104 Count 10: Mr. Marshall knowingly violated former RPC 8.4(c) when he made one or more misrepresentations in his letters of June 17, 2002, and July 31, 2002, attempting to coerce Mrs. Wormack and Mrs. Harris to settle their case with the Grand Chapter. This caused both potential and serious injury to his clients as Mr. Marshall was attempting to benefit himself by getting his clients' cases out of his office, contrary to their wishes, after they refused to pay him additional fees.
¶ 105 The hearing officer correctly applied ABA Standards std. 4.61. This standard provides:
Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client.
¶ 106 Taking into account the aggravating and mitigating circumstances, the hearing officer found no reason to depart from the presumptive sanction and recommended disbarment. The Board unanimously agreed. We find no reason to depart from the recommendation.
¶ 107 Count 11: Mr. Marshall knowingly violated former RPC 1.2(a) by failing to abide by the decision of Mrs. Wormack and Mrs. Harris to not settle their claims against the Grand Chapter and by continuing to force a settlement contrary to his clients' wishes. Mr. Marshall's actions caused potential and actual injury to his clients.
¶ 108 The hearing officer correctly applied ABA Standards std. 4.42(a). This standard provides:
Suspension is generally appropriate when:

*309 ... a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client.
¶ 109 However, taking into account the aggravating and mitigating circumstances, the hearing officer concluded that the recommended sanction should be disbarment. The Board unanimously agreed. We find no reason to depart from the recommendation.

3. Hearing Officer's and Board's Recommendation

¶ 110 The hearing officer and Board agreed Mr. Marshall should be disbarred. Additionally, the hearing officer recommended Mr. Marshall be ordered to pay restitution of $7,500 to Mrs. Wormack and $7,500 to Mrs. Harris.[27]

4. Proportionality

¶ 111 Mr. Marshall argues the Board's recommended sanction is not proportionate to other similar cases. Under a proportionality review, the Board considers whether the recommended sanction is appropriate by comparing the case at hand with other similar cases in which the same sanction was approved or disapproved. Cohen II, 150 Wash.2d at 763, 82 P.3d 224. The Board takes into account all of the lawyer's misconduct, including his record of prior disciplinary offenses and prior similar misconduct. In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 616, 9 P.3d 193 (2000). Mr. Marshall bears the burden of proving that the recommended sanction is disproportionate. In re Disciplinary Proceeding Against Kagele, 149 Wash.2d 793, 821, 72 P.3d 1067 (2003).
¶ 112 Mr. Marshall fails to carry his burden of proving the recommended sanction is disproportionate. He cites primarily to two cases that resulted in a suspension and notes a number of others in two footnotes. See In re Disciplinary Proceeding Against Egger, 152 Wash.2d 393, 416-18, 420, 98 P.3d 477 (2004) (six month suspension for knowingly billing a client for work that was partially paid by third party and failing to obtain written consent for a potential conflict of interest); In re Disciplinary Proceeding Against Gillingham, 126 Wash.2d 454, 468, 896 P.2d 656 (1995) (60 day suspension for obtaining loan from client without proper safeguards, and drafting will in which lawyer is named as beneficiary).
¶ 113 These cases do not support a conclusion that the recommended sanction of disbarment is disproportionate. Mr. Marshall's history of previous violations, coupled with the multiple, serious violations before us now, are simply not comparable with the cases Mr. Marshall cites. Therefore, there is no reason to conclude the recommended sanction of disbarment is inappropriate.

CONCLUSION
¶ 114 Finding no reason to depart from the hearing officer's recommendation unanimously affirmed by the Board, we disbar Mr. Marshall and require him to pay restitution.[28] "We have `adopted the standard ... that the Board's recommendation should be affirmed unless this court can articulate a specific reason to reject the recommendation.'" In re Disciplinary Proceeding Against DeRuiz, 152 Wash.2d 558, 572, 99 P.3d 881 (2004) (alteration in original) (quoting In re Disciplinary Proceeding Against McLeod, 104 Wash.2d 859, 865, 711 P.2d 310 (1985)). There is no reason to depart from the hearing officer's and unanimous Board's recommendation to disbar. Several of the violations, standing alone, warrant disbarment. When the violations are considered together, along with the substantial aggravating factors in this case, disbarment is the appropriate sanction.
*310 ¶ 115 Mr. Marshall attempted to squeeze his clients for additional fees despite the flat fee agreement. One of these clients was forced to obtain her own counsel to defend herself once Mr. Marshall filed a lawsuit and a lien against her. He tried to bully his clients into settling their claims, despite their express desire to proceed to trial. He declined to defend them from that point on, demanding they accept the settlement or pay him more money. Additionally, Mr. Marshall committed other violations supporting the Board's recommendation to disbar and has a history of violating the Rules of Professional Conduct. We therefore disbar Mr. Marshall in accordance with the hearing officer's and Board's unanimous recommendation and require him to pay restitution as set forth by the hearing officer.
WE CONCUR: GERRY L. ALEXANDER, Chief Justice, SUSAN OWENS, CHARLES W. JOHNSON, BARBARA A. MADSEN, RICHARD B. SANDERS, DEBRA L. STEPHENS, TOM CHAMBERS, Justices, and STEPHEN J. DWYER, J. Pro Tem.
NOTES
[1] We have limited the facts, conclusions of law, and discussion of sanctions to those dealing with violations serious enough to warrant disbarment. As we find the facts before us to be sufficient to disbar Mr. Marshall, we need not review the other charged counts where the hearing officer recommended a sanction less than disbarment. See In re Disciplinary Proceeding Against Petersen, 120 Wash.2d 833, 854, 846 P.2d 1330 (1993) (the "`ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct ...'") (quoting Am. Bar Ass'n, Standards for Imposing Lawyer Sanctions 6 (1986)).
[2] Patricia's husband was also included in the lawsuit.
[3] Lindia Richard had filed a separate lawsuit against the Grand Chapter and was represented by a different attorney. In June 2002, Mr. Marshall agreed to represent Mrs. Richard as well. However, Mr. Marshall's agreement with Mrs. Richard provided for an hourly fee of $175. Mr. Marshall did not explain to his other clients the implications of adding Mrs. Richard to the case, nor did he get a waiver.
[4] Initially, Mrs. Wormack and Mrs. Richard were not included as defendants in the Grand Chapter litigation. They were added in May 2001.
[5] Mr. Marshall admitted in his pleadings that he demanded additional fees at this point. But at the hearing, he testified that it was not additional fees, but rather an additional deposit against costs, that he was demanding. The hearing officer found Mr. Marshall to be not credible.
[6] The original fee agreement provided for a flat fee unless the lawyer and the clients "otherwise agreed."
[7] There is evidence Mr. Marshall had sent Mr. Thomson, the attorney for the Grand Chapter, a copy of his July 31 letter to his clients. Transcript of Proceedings (Tr.) (Feb. 20, 2007) at 166. Mr. Thomson testified that Mr. Marshall recommended he should bring the motion to compel settlement. Tr. (Feb. 20, 2007) at 84-85, 122-26. However, these facts were not found by the hearing officer.
[8] The hearing officer found Mr. Marshall had incurred $14,523.10 in costs in the Rheubottom litigation as of June 5, 2002. Between June 5, 2002, and January 21, 2003, he had incurred approximately $4,300 in costs and was likely to incur less than $500 in additional costs regarding the Rheubottom litigation.
[9] Mr. Marshall issued Mrs. Richard an invoice the same day, charging her for $900 in legal services and reflecting a $900 payment. Ex. 41. Over the next few months, the additional $100 remaining from Mrs. Richards' initial $1,000 payment did not show up on any invoices. However, the amount did show as a credit to her account on November 1, 2002. Ex.81.
[10] By letter dated June 16, 2003, the WSBA requested a response to Mrs. Richard's grievance. Between that date and March 1, 2005, Mr. Marshall failed to respond to the WSBA requests in some manner. Over the course of that time, the WSBA filed multiple subpoenas in order to obtain the necessary information.
[11] The original complaint alleged 9 charges. The amended complaint alleged 12. Ex. 119.
[12] The WSBA alleged Mr. Marshall violated former RPCs 1.2(a), 1.5(a), 1.7(b), 1.14(a), 1.14(b)(3), 8.4(a), 8.4(c), 8.4(d), and 8.4(l). Unless otherwise indicated, all references to the RPCs are to the rules in effect before the September 1, 2006, amendments.
[13] Amended findings and conclusions with the same recommendation were entered on March 29, 2007.
[14] The list includes instances in which "(i) [t]he hearing officer has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; (ii) [t]he hearing officer previously served as a lawyer or was a material witness in the matter in controversy, or a lawyer with whom the hearing officer previously practiced law served during such association as a lawyer concerning the matter, or such lawyer has been a material witness concerning it; (iii) [t]he hearing officer knows that, individually or as a fiduciary, the hearing officer ... has an economic interest in the subject matter in controversy or in a party to the proceeding, or is an officer, director or trustee of a party or has any other interest that could be substantially affected by the outcome of the proceeding, unless there is a remittal of disqualification." ELC 2.6(e)(4)(A).
[15] The conflicts issues ranged from how costs of the litigation would be allocated among, now, five clients; how global settlement proposals would be dealt with if one client wanted to settle and others did not; and how the different agendas of Mrs. Harris and Mrs. Wormack would be reconciled.
[16] Mrs. Rheubottom paid $11,500 and Mrs. Wormack paid $3,500. Ex. 4.
[17] Mr. Marshall contends that although he did admit to this fact in his answer, it was disputed in the hearing and litigated by both parties.
[18] From start to finish, for all clients, Mr. Marshall billed $18,914.51 for costs. Ex. 78-81. Of that amount, over $4,400 were fees paid for contract workers that Mr. Marshall hired to do the work his clients believed he would be doing. Ex. 48.
[19] On the first morning of trial, when confronted with a defense motion to dismiss with prejudice for failure to participate in pretrial procedures, Mr. Marshall, at the suggestion of the trial judge, attempted to preserve the claims of Mrs. Wormack and Mrs. Harris by taking a voluntary nonsuit.
[20] Mr. Marshall handled the same claims against his other clients who paid him in a very different manner. He wrote to the court arguing that "none of the attorneys appeared in open court and dictated any purported terms of any settlement agreement on the record or in the presence of the Clerk." Ex.39.
[21] He claims he should have used the word "settled" instead of "dismissed."
[22] The e-mail stated:

I thought the matter was settled Monday night. Because the terms were simple and the lateness of the hour I did not write out a quick CR2A agreement. My mistake, although I am not sure now that they all would have signed it.
I met with them all this morning. They are in good faith and I don't believe that there are any improprieties going on. Ex. 84.
[23] After receiving Mr. Marshall's June 17, 2002 letter, Mrs. Wormack responded, "I feel that you are threatening Ms. Harris and I." Ex. 43. She had spent the first portion of her letter rejecting Mr. Marshall's claim that she had settled and rejecting his demand for additional fees should the case not be settled. Id.
[24] The hearing officer also found the issues regarding the conflict of interest ranged from how costs of the litigation would be allocated, how global settlement proposals would be dealt with if one client wanted to settle and others did not, and how the different agendas of Mrs. Harris and Mrs. Wormack would be reconciled.
[25] Mr. Marshall first complains that the bar failed to allege specific facts concerning what the conflict of interest was. He argues this was a violation of his due process rights. However, this is not a contention surrounding the findings of fact and will be dealt with later in the opinion.
[26] The hearing officer dismissed the allegations as to Mr. and Mrs. Rheubottom and Mrs. Richard.
[27] The hearing officer also recommended that $4,000 of the restitution for the benefit of Mrs. Wormack be paid in a joint check to Mrs. Wormack and Mrs. Rheubottom, or $4,000 paid to Mrs. Rheubottom and $3,500 to Mrs. Wormack.
[28] Mr. Marshall makes no specific argument as to why he should not have to pay Mrs. Wormack and Mrs. Rheubottom an amount equaling the initial retainer fee. Considering Mr. Marshall abandoned his clients prior to trial, such an award is justified. We therefore require Mr. Marshall to pay $7,500 each to Mrs. Wormack and Mrs. Rheubottom.