**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE____ JUL 0 3 2014

_Fairhurst, Q._
_for_ CHIEF JUSTICE

This opinion was filed for record
at _8:00 a m_ on _July 3, 2014_

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IN THE MATTER OF THE DISCIPLINARY PROCEEDING AGAINST: | ) ) ) ) | |
| | ) | No. 88513-3 |
| Lori A. Petersen, Certified Professional Guardian No. 9713, | ) ) ) | En Banc |
| | ) | |
| Petitioner. | ) ) ) | Filed ____ JUL 0 3 2014 |

GONZÁLEZ, J.—The Certified Professional Guardianship Board (Board) has asked us to suspend guardian Lori Petersen for actions stemming from her guardianship of D.S. and J.S. Petersen contends that this sanction is improper and suggests the Board has run afoul of separation of powers principles, violated the appearance of fairness doctrine, impermissibly lowered the evidentiary standard, and failed to consider the proportionality of the sanction. We agree with Petersen as to her last contention. She has questioned, albeit obliquely, the proportionality of the sanction, and so the Board should have considered the sanction's magnitude

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

relative to those imposed in other cases. Accordingly, we remand to the Board to conduct a consistency analysis pursuant to its internal regulations and this opinion.

## FACTS AND PROCEDURAL HISTORY

Petersen has been a certified professional guardian since 2001. She owns and operates Empire Care and Guardianship, a large agency serving over 60 wards. She served on the Board from 2003 until 2009 and sat on the Standards of Practice Committee (SOPC).[1] From December 2009 until April 2010, the Board received a number of grievances and complaints regarding Petersen's treatment of three wards who were all, at one point, housed at Peterson Place, an adult family home. Following protocol, the SOPC opened files for each grievance and informed Petersen that an investigation would be forthcoming.

According to Petersen, Commissioner Valente, who was the chair of the SOPC and had served on the Board with Petersen,[2] encouraged the SOPC to conduct a factual inquest to see if the charges were substantiated. Though the

---

[1] Among other duties, the SOPC reviews grievances that have been filed with the Board. Certified Prof'l Guardianship Bd. (CPGB) Program Rules 506.1 (Disciplinary Regulation (DR) 506.1). For electronic access to current DRs, see note 3, *infra*. When examining a grievance, the SOPC can (1) request further information from the Administrative Office of the Courts (AOC), (2) dismiss the grievance, (3) request that the board file a formal complaint, (4) request that the Board enter into an agreement regarding discipline, or (5) direct that AOC contact the professional guardian to discuss a minor disciplinary issue. *Id.* The SOPC may also "direct AOC to obtain the statement of any person believed to have information relevant to the grievance." DR 506.1.1.

[2] Petersen believes her confrontational relationship with Commissioner Valente during her tenure on the Board precipitated his actions. Opening Br. of Lori Petersen at 30-31.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

record is silent on this point, presumably the SOPC agreed because Commissioner Valente conducted an inquest hearing in his courtroom on July 15, 2010. At this hearing, Petersen was sworn in, was represented by counsel, and was given the opportunity to present testimony and offer evidence. Commissioner Valente also questioned Petersen at length with no objections from Petersen's attorney. As a result of these hearings, Commissioner Valente composed several written opinion letters that he sent to Petersen and others involved in the proceeding. To the Board, he recommended that a complaint be filed. The Board agreed and served Petersen with a complaint on April 25, 2012. In it, the Board charged Petersen with violating nine different standards of practice (SOPs).[3] Petersen filed a timely answer that denied all the allegations and set out affirmative defenses. Petersen also sought to have the complaint dismissed with prejudice and to be reimbursed for costs and attorney's fees. When attempts to reach an agreed settlement failed, the Board served Petersen with a notice of hearing.

Two and a half days of hearings were held in late October 2012 before Hearing Officer Roderick Simmons. Each side was allowed to submit briefing. The Board presented seven witnesses, and Petersen called four, including herself,

---

[3] The SOPs have been renumbered since this action began. Because the CPGB Guardianship Program Rules ch. 400 (SOPs) are not available under the former codification, we cite the current numeration as long as the substance of the standard has remained substantially the same. In cases where the standards have been amended, they are cited as former SOP and a footnote with the text of the standard is provided. Current SOPs and DRs are available at http://www.courts.wa.gov/programs_orgs/Guardian/?fa=guardian.display&fileName=rulesindex.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to the stand. A joint binder of exhibits was also admitted. The hearing officer considered all the evidence and testimony and entered findings of fact, conclusions of law, and a recommendation.

*A. Findings Regarding the Guardianship of D.S.*

D.S. was an elderly woman who suffered from dementia. She was placed at Peterson Place when her granddaughter could no longer provide adequate care. Petersen became D.S.'s guardian in March 2009. In August 2009, D.S.'s granddaughter asked Heidi Peterson[4] to obtain new glasses for D.S. because D.S. was an avid reader and her old glasses were scratched and broken. Petersen did not think D.S. needed a new pair but permitted Heidi Peterson to look into the matter. Heidi Peterson took D.S. to the optometrist for an initial appointment. But there was no follow up, and the optometrist's office could not reach Petersen. This resulted in a considerable delay that the Hearing Officer found inexcusable and unnecessary. Ex. 10, at 830 (Findings of Fact (FF), Conclusions of Law (CL), & Recommendations to Bd. for Action). He determined that Petersen was dismissive of the need to replace the glasses and that "she exhibited little enthusiasm for completing the steps necessary to facilitate this activity of daily living that is so

---

[4] Heidi Peterson is the owner of Peterson Place Adult Family Home, where D.S. was living at the time that Petersen was her guardian.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

enjoyed by D.S." *Id.* at 829. The hearing officer determined this was a violation of SOP 402.2[5] and 405.1.[6]

In October 2009, Heidi Peterson notified Petersen that D.S.'s physical condition had worsened and Petersen authorized a trip to the hospital. Petersen failed to inform D.S.'s family of these events until after the hospitalization began, which the hearing officer determined to be a violation of SOP 402.2 and 405.1.

Toward the end of October 2009, Petersen decided to move D.S. from Peterson Place. Petersen claimed the move was necessary because the facility did not provide 24-hour nursing care. The hearing officer found that Petersen made "no showing that any quality of care issues could not have been addressed by discussion and communication." *Id.* at 830. Also, the hearing officer found that Petersen was dismissive of and incommunicative with D.S.'s family members. Because Petersen did not have justification to move D.S. and because she did not seek input from D.S.'s friends and family, Hearing Officer Simmons found she violated SOP 402.2 and 405.1.

---

[5] "The guardian, where appropriate, shall consider the views and opinions of professionals, relatives, and friends who are knowledgeable about the incapacitated person." SOP 402.2.

[6] "The primary standard for decision-making is the Substituted Judgment Standard based upon the guardian's determination of the incapacitated person's competent preferences, i.e. what the incapacitated person would have decided when he or she had capacity. The guardian shall make reasonable efforts to ascertain the incapacitated person's historic preferences and shall give significant weight to such preferences. Competent preferences may be inferred from past statements or actions of the incapacitated person when the incapacitated person had capacity." SOP 405.1.

*B. Findings Regarding the Guardianship of J.S.*

J.S. was 18 years old when Petersen became his guardian. He suffered from a hereditary spinocerebellar ataxia disorder that caused muscle spasticity and blindness, rendered him wheelchair bound, and shortened his life expectancy. Despite these physical limitations, J.S. was able to express his desires and was aware of the terminal nature of his disease. He was moved from a family member's house, where he was being abused, into Peterson Place in May 2009. The hearing officer found that Petersen knew how deeply J.S. was affected by this move.

Nonetheless, on October 30, 2009, Petersen's staff moved J.S. out of Peterson Place and into a hospice facility. The move occurred nine days after a petition to replace Petersen as J.S.'s guardian was filed. Petersen believed the move was necessary due to an order J.S.'s doctor issued on October 29, 2009 that recommended that J.S. receive hospice care or be put in a skilled nursing facility. No one spoke to J.S. about the move nor sought to learn his wishes.

Melody Hayashi-Taisy, J.S.'s teacher, friend, and advocate, came to Peterson Place as soon as she learned of the pending move. She described the scene as chaotic. J.S. was upset that he was being moved and understood that hospice care was for terminally ill patients. During this process, Petersen was not at Peterson Place and did not directly oversee the move.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Ultimately, J.S. was taken to the hospice facility without his reclining wheelchair, which was a source of security for him and where he preferred to spend substantial time. Once there, J.S. sobbed, screamed, and was disruptive. Staff at the facility did not know what to do and could not reach Petersen, so they called Hayashi-Taisy instead. Hayashi-Taisy brought J.S. his wheelchair and stayed with him until he went to sleep. On November 4, 2009, Petersen was replaced as J.S.'s guardian. With his doctor's consent, the new guardian moved J.S. back into Peterson Place and arranged for 24-hour nursing care there.

The hearing officer found that Petersen exhibited no regard for J.S.'s interests or opinions in moving him to hospice care. Petersen did not explain why she failed to consider placing J.S. in a skilled nursing facility or arrange for appropriate care at Peterson Place. The hearing officer found that this lack of regard for J.S.'s wishes and needs, especially during days that were then-perceived

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to be his last, was in violation of SOP 403.1[7] and 402.2 and former SOP 401.12,[8] 401.15,[9] and 404.5.[10]

*C. Recommended Sanctions*

The hearing officer found that the SOPs that Petersen violated involved the paramount duty of a guardian—to actively seek information and input from the ward and others close to the ward to ensure appropriate care and residential placement decisions. Hearing Officer Simmons also considered the relevant aggravating and mitigating factors and the weight that each factor should be given in making his recommendation to the Board. Specifically, he determined that Petersen's significant experience as a guardian, her failure to acknowledge her wrongful conduct, her prior disciplinary history, and the vulnerability of her wards were all aggravating circumstances that should be given significant weight. Though he determined that Petersen's cooperation and her willingness to take

---

[7] "The civil rights and liberties of the incapacitated person shall be protected. The independence and self-reliance of the incapacitated person shall be maximized to the greatest extent consistent with their protection and safety. The guardian shall protect the personal and economic interests of the incapacitated person and foster growth, independence, and self-reliance." SOP 403.1.

[8] "When possible, the guardian will defer to an incapacitated person's autonomous capacity to make decisions." Former SOP 401.12.

[9] "Guardians of the Person shall have meaningful in-person contact with their clients as needed and shall maintain telephone contact with care providers, medical staff and others who manage aspects of care as needed an appropriate. Meaningful in-person contact shall provide the opportunity to observe the incapacitated person's circumstances and interactions with care providers." Former SOP 401.15.

[10] "The guardian, shall, to the extent possible, select residential placements which enhance the quality of life of the incapacitated person, provide the opportunity to maximize the independence of the incapacitated person, and provide for physical comfort and safety." Former SOP 404.5.

cases from Adult Protective Services were mitigating circumstances, Hearing Officer Simmons did not afford these factors much weight. Finally, he found that both D.S. and J.S. suffered actual, significant injuries.

Given these findings, Hearing Officer Simmons determined that a letter of reprimand was insufficient. Instead, he recommended that Petersen be (1) suspended for one year for her misconduct regarding the relocation of D.S. and J.S.; (2) concurrently prohibited from taking new cases for 3 months for the delay in obtaining new glasses for D.S.; (3) subjected to a probationary period of 24 months postsuspension, where any relocation decision would be reviewed by a different certified professional guardian; and (4) required to pay costs of proceedings.

The hearing officer's findings of fact, conclusions of law, and recommendation as well as Petersen's objection were submitted to the Board. The Administrative Office of the Courts also submitted a declaration that documented the fees and costs associated with the disciplinary matter, which totaled $40,366.16. The Board considered the matter at its January 30, 2013 meeting. The board members who did not have a conflict of interest voted six to one to adopt the hearing officer's recommended sanctions. They declined to impose the costs associated with hiring the hearing officer, lowering the fees to $32,393.66. The lone dissenting board member argued that no fees should be imposed because the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

hearing officer did not state a basis for imposing fees, he did not know the amount of fees that would be imposed, and that the imposition of fees and costs should be equitable and in proportion to the misconduct. The Board submitted the record and its recommendation for our review. Petersen petitioned this court to permit briefing and oral argument. We granted the petition and now affirm in part and remand for further proceedings consistent with this opinion.

ANALYSIS

*Standard of review*

Petersen takes issue both with Hearing Officer Simmons's factual findings and his conclusions of law. We give "a hearing officer's findings of fact 'considerable weight,' . . . and will uphold the findings where they are supported by 'substantial evidence.'" *In re Disciplinary Proceeding Against Ferguson*, 170 Wn.2d 916, 927, 246 P.3d 1236 (2011) (quoting *In re Disciplinary Proceeding Against Botimer*, 166 Wn.2d 759, 767, 214 P.3d 133 (2009)). The burden is on the party challenging the findings of fact to properly assign error and to establish that specific challenged findings are not supported by the record. *See In re Disciplinary Proceeding Against Kronenberg*, 155 Wn.2d 184, 191, 117 P.3d 1134 (2005) (quoting *In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 814, 72 P.3d 1067 (2003); *In re Disciplinary Proceeding Against Haskell*, 136

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Wn.2d 300, 311, 962 P.2d 813 (1998)). Because Petersen has failed to properly assign error to the hearing officer's factual findings, we do not disturb them.

We review legal questions and the Board's conclusions of law de novo. *See In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 717, 72 P.3d 173 (2003).

*A. Separation of powers*

"Our constitution does not contain a formal separation of powers clause." *Brown v. Owen*, 165 Wn.2d 706, 718, 206 P.3d 310 (2009) (citing CONST. art. II, § 1, art. III, § 2, art. IV, § 1; *Carrick v. Locke*, 125 Wn.2d 129, 134-35, 882 P.2d 173 (1994)). "'Nonetheless, the very division of our government into different branches has been presumed throughout our state's history to give rise to a vital separation of powers doctrine.'" *Id.* (quoting *Carrick*, 125 Wn.2d at 135). "'The doctrine serves mainly to ensure that the fundamental functions of each branch remain inviolate.'" *Id.* (quoting *Carrick*, 125 Wn.2d at 135). At its crux, "'[t]he question to be asked is not whether two branches of government engage in coinciding activities, but rather whether the activity of one branch threatens the independence or integrity or invades the prerogatives of another.'" *Carrick*, 125 Wn.2d at 135 (quoting *Zylstra v. Piva*, 85 Wn.2d 743, 750, 539 P.2d 823 (1975)). A delegation of authority must involve (1) standards to guide the agency and (2)

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

procedural safeguards to control for abuse of discretionary power. *State v. Simmons*, 152 Wn.2d 450, 455, 98 P.3d 789 (2004).

Petersen does not claim that the Board has been provided no standards to guide its actions. Instead, she argues that the Board has been delegated executive, legislative, and judicial power in violation of separation of powers because of insufficient procedural safeguards to control its administrative action. *See* Opening Br. of Lori A. Petersen at 17. She concludes that separation of powers and her due process rights have been violated because her disciplinary proceeding did not mirror the one approved in *Simmons*, which concerned the legislature's delegation of rule making authority to the Department of Corrections (DOC). This is not an apt comparison. Not only is *Simmons* distinguishable but also adequate process has been provided. Most importantly, none of the powers delegated to the Board threaten the integrity, independence, or prerogatives of any other branch of government.

*1. The Board's authority and structure*

To be regulated by the Board, a guardian must first fall under the statutory definition of "certified professional guardian" in RCW 11.88.008.[11] GR 23(a).

---

[11] "As used in this chapter, 'professional guardian' means a guardian appointed under this chapter who is not a member of the incapacitated person's family and who charges fees for carrying out the duties of court-appointed guardian of three or more incapacitated persons." RCW 11.88.008.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

But "'guardianships are equitable creations of the courts and it is the court that retains ultimate responsibility for protecting the ward's person and estate.'" *In re Guardianship of Lamb*, 173 Wn.2d 173, 184, 265 P.3d 876 (2011) (quoting *In re Guardianship of Hallauer*, 44 Wn. App. 795, 797, 723 P.2d 1161 (1986)). The Board was created by this court to oversee the certification, regulation, and discipline of professional guardians and related agencies. *See id.* at 185. We select the Board's members, oversee the Board's actions, ratify the Board's decisions, and enforce the Board's orders. *See* GR 23(c)(1)(i), (iii), (2)(v), (x)(c), (3).

Despite our oversight of final decisions, we delegated numerous regulatory and rule making tasks to the Board. As part of its duties, the Board must adopt and implement SOPs that govern the minimum standards that professional guardians must meet.[12] GR 23(c)(2)(ii). The Board must also adopt and implement procedures for reviewing grievances and imposing disciplinary sanctions when professional guardians fail to comply with relevant standards, statutes, duties, or other requirements. GR 23(c)(2)(viii). The Board can investigate potential

---

[12] In *Guardianship of Lamb*, we summarized the purpose of SOP provisions:

> These standards direct guardians to provide timely and accurate reports to the court, act within the scope of the appointed guardianship, consult with the incapacitated person and defer to that person's autonomous decision-making capacity when possible, cooperate with professional caregivers and relatives of the incapacitated person, and seek independent professional evaluations and opinions when necessary to identify the incapacitated person's best interests.

173 Wn.2d at 185.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

violations on its own initiative and has authority to conduct hearings and issue enforceable orders. GR 23(c)(2)(ix)-(x). To help carry out these duties, the Board has promulgated rules and regulations, SOPs, and Disciplinary Regulations (DRs).

*2. The powers delegated to the Board do not undermine the integrity, independence, or prerogatives of any other branch*

Petersen challenges our delegation of a quasi-legislative power (rule making), quasi-executive power (investigation and prosecution), and quasi-judicial power (conducting hearings) to the Board. This, however, is insufficient to maintain a separation of powers violation. Like attorneys, guardians are officers of the court. *See Seattle-First Nat'l Bank v. Brommers*, 89 Wn.2d 190, 200, 570 P.2d 1035 (1977) ("The court having jurisdiction of a guardianship matter is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court."). Like with attorney discipline, with guardian discipline "[w]e have 'the inherent power to promulgate rules of discipline, to interpret them, and to enforce them.'" *In re Disciplinary Proceeding Against Haley*, 156 Wn.2d 324, 333, 126 P.3d 1262 (2006) (emphasis omitted) (quoting *In re Disciplinary Proceeding Against Stroh*, 97 Wn.2d 289, 294, 644 P.2d 1161 (1982)).

With such broad plenary power over guardianship practice, our delegation of rule making, investigation and prosecution, and adjudication to the Board does not run afoul of separation of powers principles. Furthermore, combining such powers

14

in a disciplinary and regulatory board is well precedented. *See In re Disciplinary Proceeding Against Deming,* 108 Wn.2d 82, 106-07, 736 P.2d 639 (1987) ("The failure to strictly adhere to a complete separation of the investigatory, prosecutory and adjudicatory phases is not always a violation of due process."). Here, the Board's authority does not impinge on the legislature's prerogative to statutorily define "certified public guardian" or the executive's ability to investigate and prosecute guardians under the law. All of the Board's regulatory authority is that within the province of the judiciary, and so the delegation is proper.

*3. There are enough procedural safeguards to ensure that the power delegated by this court is not abused or arbitrarily administered*

Though the Board's procedures do not mirror those approved in *Simmons,* they are sufficient to satisfy due process considerations in guardianship discipline. *Simmons* concerned the legislature's delegation of rule making authority to the DOC that effectively allowed the agency to define criminal conduct, traditionally a core legislative function. 152 Wn.2d at 452, 457. Simmons, who was in the custody of the DOC, was charged with persistent prison misbehavior under RCW 9.94.070. *Id.* at 452. He argued that the statute impermissibly delegated legislative authority to the DOC. *Id.*[13] We disagreed because "[t]he DOC afforded Simmons with access to the disciplinary code upon his admission into custody, the

---

[13] The statute in question allowed the DOC to enact rules that defined the serious infractions that would constitute criminal misbehavior.

right to appeal any adverse disciplinary hearing findings to the prison

superintendent, and the constitutional rights attendant to a criminal proceeding."

*Id.* at 458.

Here, the Board is not criminalizing behavior or defining terms in a statutory

scheme, and so the cases present very different concerns. Nonetheless, the Board

has enacted a set of procedures that give comparable protections to guardians

facing discipline. The Board (1) provides sufficient notice of all regulations to

certified professional guardians;[14] (2) treats a hearing officer's findings of fact and

conclusions of law in discipline cases as a recommendation;[15] and (3) judicial

review is mandatory for cases that result in suspension or decertification.[16]

The Board's structure and authority do not violate any separation of powers

principles. Our plenary authority over guardianships, our delegation of exclusively

---

[14] The Board is required to provide notice whenever any regulation is being adopted, repealed, or modified. CPGB Guardianship Program Rules 602.1 (Procedure for Adoption Amend. & Repeal of Regulations (Reg.) 602.1). All notices must have the text of the proposed change. Reg. 602.1.1. All proposed changes must also be posted on the Board's web site as well as sent electronically to the Washington Association of Professional Guardians and all certified professional guardians individually to facilitate public comment. Reg. 602.2.1, 602.2.2, 602.2.3.

[15] By regulation, a hearing examiner's findings of fact and recommendation is merely a recommendation to the Board, which has an opportunity to review the findings and to accept, reject, or modify them. DR 512. The record adequately shows that the Board reviewed the recommendation in Petersen's case. Ex. 17, at 1616-17 (Bd. Special Called Exec. Session Meeting). And so, like the litigant in *Simmons* whose case was reviewed by the superintendent, Petersen did receive a second look from an administrative source.

[16] This court must review all disciplinary cases that result in a recommendation of suspension or decertification. DR 513.2. Although we generally do not accept briefing or hear oral arguments in such cases, we do review a complete record and have the authority to adopt, modify, or reverse the Board's findings by written order. DR 513.3.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

judicial authority, and the adequacy of the procedures afforded during the disciplinary process permit the melding of quasi-legislative, quasi-judicial, and quasi-executive powers in this context.

*B. Appearance of fairness doctrine*

Petersen believes that Commissioner Valente's actions as a member of the SOPC and his persistence in pursuing the disciplinary action violate the appearance of fairness doctrine. *See* Opening Br. of Lori A. Petersen at 30. She also claims that Hearing Officer Simmons's financial interest in being retained for future disciplinary proceedings also runs afoul of this doctrine. *See id.* at 32. We disagree.

We apply the appearance of fairness doctrine to quasi-judicial proceedings in two circumstances: "(1) when an agency has employed procedures that create the appearance of unfairness and (2) when one or more acting members of the decisionmaking bodies have apparent conflicts of interest creating an appearance of unfairness or partiality." *City of Hoquiam v. Pub. Emp't Relations Comm'n*, 97 Wn.2d 481, 488, 646 P.2d 129 (1982) (citation omitted). That said, "we detect no inherent unfairness in the mere combination of investigative and adjudicative functions, *without more*, that would prompt invocation of the appearance of fairness doctrine. [Also, w]e must presume the board members acted properly and legally performed their duties until the contrary is shown." *Wash. Med.*

*In re Petersen*, No. 88513-3

*Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 479, 663 P.2d 457 (1983) (emphasis added).

Though Commissioner Valente's inquest may be characterized as prosecutorial and therefore exempt from the appearance of fairness doctrine,[17] to an outside observer the hearing bore many hallmarks of a judicial or quasi-judicial proceeding. The hearing was conducted in his courtroom during court hours, and Petersen was represented by counsel and gave testimony under oath. Accordingly, in this instance, we apply the appearance of fairness inquiry to the inquest.

Petersen characterizes Commissioner Valente's inquest as "unprecedented crusading" and essentially contends that the disciplinary action is a result of his personal vendetta and bias against her. *See* Opening Br. of Lori A. Petersen at 30. Nothing in the record, other than Petersen's allegations, supports this contention. In fact, the hearing officer found that "[t]he transcripts from the hearings [Commissioner Valente] conducted and the written opinion letters he issued demonstrate he acted fairly in all particulars related to these grievances." Ex. 10, at 828 (FF, CL, & Recommendations to Bd. for Action). Without any material evidence suggesting impropriety or properly assigning error to the hearing officer's finding, Petersen fails to satisfy the "something more" requirement that is

---

[17] The doctrine does not apply to executive functions such as prosecutorial inquests or coroner inquests. *See State v. Finch*, 137 Wn.2d 792, 809-10, 975 P.2d 967 (1999); *Carrick*, 125 Wn.2d at 140-43.

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

necessary for an appearance of fairness violation and so her charge against Commissioner Valente must fail. *See Johnston*, 99 Wn.2d at 479.

The same can also be said of Petersen's charge against Hearing Officer Simmons. That the Board paid the hearing officer for his services is not sufficient to maintain an appearance of fairness violation.

We presume that judicial hearings and judges are fair. *In re Disciplinary Proceeding Against King*, 168 Wn.2d 888, 904, 232 P.3d 1095 (2010). "Hearing officers are not judges, but we trust and empower them to preside over proceedings, take evidence, make findings of fact, and do other duties analogous to the role of a judge. The presumption of fairness for judges likewise applies to hearing officers in attorney disciplinary proceedings." *Id.* When an attorney facing discipline brought a similar charge against his hearing examiner, we summarily rejected this argument. *See In re Disciplinary Proceeding Against Marshall*, 167 Wn.2d 51, 69, 217 P.3d 291 (2009).[18] We extend this logic and apply it in guardian discipline as well. Petersen has failed to adduce facts that prove Hearing Officer Simmons was biased, had a conflict of interest, or would seem unfair to a reasonable observer, and so this claim must also fail.

---

[18] We found the hearing officers' "salary does not bias him any more than the salary paid to any judge who hears cases brought by the State of Washington. Additionally, [his] involvement and discussions relating to improving hearing officer performance does not show bias or the appearance of unfairness." *Marshall*, 167 Wn.2d at 69.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*C. Proper evidentiary standard*

Prior to the fall of 2011, the Board was required to prove guardian misconduct by clear and convincing evidence before disciplinary sanctions could be imposed. During its September 2011 meeting, the Board considered changing its regulation to require a preponderance of the evidence standard of proof in light of our decision in *Hardee v. Dep't of Soc. & Health Servs.*, 172 Wn.2d 1, 256 P.3d 339 (2011). Two months later, the Board voted to adopt the preponderance standard. Petersen claims this change violated her due process rights. She argues that the amount of education and testing necessary to become a certified professional guardian entitles her to have the hearing examiner apply the clear and convincing evidence standard. Opening Br. of Lori A. Petersen at 33-34. Petersen argues that guardians should be treated like physicians for the purposes of this inquiry and that *Nguyen v. Dep't of Health, Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 29 P.3d 689 (2001), rather than *Hardee*, is controlling. She is mistaken. Applying the *Mathews v. Eldridge* three-part balancing test,[19] we are satisfied that a preponderance of the evidence standard adequately protects

---

[19] Under *Mathews*, we must balance (1) the private interest at stake, (2) the risk of an erroneous deprivation of the interest and probable value of additional procedural safeguards, and (3) the government's interest including fiscal and administrative burdens that the additional procedures would entail. 424 U.S. at 335.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Petersen's property interest in continued certification. 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

*1.* Mathews *Test: private interest*

The private interest involved in certification is substantial, but not as substantial as licensing for a physician. To become a professional certified guardian, an applicant must (1) be over 18 years of age and of suitable character; (2) have an associate's degree and four years' experience, have a bachelor's degree and two years' experience, or have a higher degree and one year's experience; and (3) have successfully completed a nine month certificate program. GR 23(d)(1). In comparison, "[b]ecoming a licensed physician requires a four year undergraduate degree, a four year postgraduate degree, and additional years of residency training. Physicians must pass multiple tests and examinations before licensure and maintain continuing educational requirements thereafter." *Hardee*, 172 Wn.2d at 13. The required work experience, nine month certificate program, and college degree are not commensurate with the requirements for medical practice. Furthermore, nothing but the certificate requirement is specific to guardianship practice, which also diminishes the private interest to some degree.

*2.* Mathews *Test: risk of erroneous deprivation*

The risk of erroneous deprivation of a guardian's ability to practice may not be substantially decreased by a higher evidentiary standard because the Board's

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

disciplinary process already includes procedural safeguards that minimize the potential of wrongful suspension or decertification.

Virtually all procedural safeguards available in comparable professional discipline processes are afforded guardians. A copy of a valid grievance is sent to the guardian who then has an opportunity to respond in writing. DR 504.5. The SOPC then reviews the grievance for merit and provides a recommendation to the Board. DR 505.1. Guardians can be represented by counsel at all stages of the proceeding. DR 509.1. Formal proceedings begin after the guardian has been served with a complaint that sets out specific alleged violations and supporting facts. DR 510.1. The guardian may file a response to the complaint. DR 510.5, 510.7. Prior to any hearing, the parties must exchange witness lists and exhibits. DR 511.12. Both the Board and the guardian may subpoena witnesses and present witness testimony at the hearing. DR 511.9, 511.11. Some discovery is available. DR 511.10. When considering what action to take, the Board reviews the hearing officer's findings of fact, conclusions of law, and recommendation alongside the guardian's statement in opposition and rebuttal, if one is filed. DR 512.2, 512.3. Finally, this court reviews all decisions that seek to suspend or decertify the guardian. DR 513.2. During this process, a guardian will not have his or her certification suspended unless there is a substantial risk of injury to the public or the guardian fails to cooperate. DR 519. An intermediate evidentiary standard

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

may well provide guardians facing discipline additional protections from the risk of erroneous deprivation. Nonetheless, we are satisfied that, given the other existing safeguards, this risk is sufficiently remote even with the preponderance standard.

*3.* Mathews *Test: governmental interest*

The State's interest, on the other hand, is very significant. The State is the ultimate guardian of the ward and bears responsibility for protecting the ward's person and estate, while the appointed guardian is just an officer of the court. *See Guardianship of Lamb*, 173 Wn.2d at 184; *Brommers*, 89 Wn.2d at 200. More importantly, guardians are appointed only for the most vulnerable individuals who are incapable of making their own critical decisions, much less vindicating their rights. This factor weighs strongly in favor of finding the lower standard of proof is sufficient in guardian discipline cases. Like the lead opinion concluded in *Hardee*, here too it is critical that the Board be able to effectively regulate guardians so as to protect the most vulnerable individuals. *See* 172 Wn.2d at 12.

We find no error in the Board's decision to apply a preponderance standard to its disciplinary process: the private interest involved does not outweigh that of the State, and the Board has provided ample procedures to ensure that the risks of erroneous deprivation are minimal.

*D. Proportionality analysis*

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Petersen questions whether the sanctions that the Board recommends are overly severe for the charged offense. *See* Opening Br. of Lori A. Petersen at 42-43. Generally, the party facing discipline "bears the burden of showing the Board's recommended sanction is not proportionate." *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 38, 232 P.3d 1118 (2010). Though we maintain this principle, we find sufficient reasons to depart from it in this particular case.

Petersen must bear the burden of proving disproportionality. But we remain mindful of the Board's regulations, which establish that the SOPs

are designed to promote:

Consideration of all factors relevant to imposing the appropriate level of sanction in an individual case;

Consideration of the appropriate weight of such factors in light of the stated goals of guardian discipline; and

Consistency in the imposition of disciplinary sanctions for the same or similar offenses."

DR 501. Because this is a case of first impression and the Board aspires to consistency with disciplinary sanctions, we remand to the Board to consider whether the sanctions sought against Petersen, including the monetary fees, are consistent with those imposed in other cases. Hearing Officer Simmons explicitly discussed the relevant factors and the weight he afforded them in reaching a recommendation of suspension and probation. He did not, however, consider

whether this recommendation deviated significantly from other disciplinary actions. We believe the circumstances of this case and the severity of the sanctions and fees in light of the charges brought by Petersen warrant an explicit proportionality inquiry.[20]

We remand for an explicit proportionality inquiry in large part because this is the first case where we have had the opportunity to hold oral argument and enter a written opinion. Henceforth, this court will consider proportionality only if it is properly raised below.

## CONCLUSION

Both in structure and in practice, the Board is constitutional. There has been no violation of separation of powers, and, given the record before us, there has been no violation of the appearance of fairness doctrine either. Moreover, considering the gravity of the governmental interest involved and the many procedural safeguards provided, we find a preponderance of the evidence to be a

---

[20] This means the Board must consider the penalties that were imposed in past cases that appear to involve similar violations of regulations or similar punishments as that in the present case. *See, e.g., In re Broom*, CPG No. 10300, CPGB No. 2011-014 (2012); *In re Gaherin*, CPG No. 10330, CPGB Nos. 2010-020, 2011-021 (2011); *In re Nelson*, CPG No. 10082, CPGB Nos. 2010-025, 2011-005, 2011-010 (2012). We acknowledge that most of the Board's prior cases were resolved by agreed settlement, and so they may well be distinguishable for that reason alone. We also acknowledge that not all cases involve the same aggravating and mitigating circumstances, and therefore a deviation in punishment may be justified. Nonetheless, the Board must provide its reasoning for its recommended sanction not just in reference to the conduct of the guardian but also in reference to past disciplinary matters. This way we will be able to assess whether the recommended punishment is consistent with other similar cases and thus whether the directives of DR 501 have been satisfied by the Board.

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

constitutionally adequate evidentiary standard for disciplinary proceedings. Nonetheless, we remand this case to the Board so it can determine whether the sanction that it has asked us to impose promotes consistency.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Petersen*, No. 88513-3

González, J.

WE CONCUR:

Madsen, C.J.

J.M. Johnson, J.P.T.

Johnson, J.

Stephens, J.

Owens, J.

Wiggins, J.

Fairhurst, J.

Gordon McCloud, J.

27