IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Guardianship of | ) | |
| | ) | No. 33356-6-III |
| JUDITH D. HOLCOMB, | ) | |
| | ) | |
| and | ) | |
| | ) | UNPUBLISHED OPINION |
| OTHER SIMILAR CASES | ) | |
| CONSOLIDATED ON APPEAL.† | ) | |

---

† No. 33357-4-III, *In re Guardianship of St. Peter*; No. 33358-2-III, *In re Guardianship of Wiegele*; No. 33359-1-III, *In re Guardianship of Daniel*; No. 33360-4-III, *In re Guardianship of Adams*; No. 33362-1-III, *In re Trust of Hartley*; No. 33363-9-III, *In re Guardianship of Ard*; No. 33364-7-III, *In re Guardianship of Wright*; No. 33365-5-III, *In re Guardianship of Friesen*; No. 33366-3-III, *In re Guardianship of Reed*; No. 33367-1-III, *In re Guardianship of Bowers*; No. 33368-0-III, *In re Special Needs Trust of Harmon*; No. 33369-8-III, *In re Guardianship of Cornelius*; No. 33370-1-III, *In re Guardianship of Mateer*; No. 33371-0-III, *In re Guardianship of Harris*; No. 33372-8-III, *In re Trust of Elvidge*; No. 33373-6-III, *In re Guardianship of Fulton*; No. 33374-4-III, *In re Guardianship of Zauner*; No. 33375-2-III, *In re Guardianship of Martin*; No. 33376-1-III, *In re Guardianship of Mateer*; No. 33377-9-III, *In re Guardianship of Carey*; No. 33378-7-III, *In re Guardianship of Olson*; No. 33379-5-III, *In re Guardianship of Nalley*; No. 33380-9-III, *In re Guardianship of Nichols*; No. 33381-7-III, *In re Guardianship of Smelcer*; No. 33382-5-III, *In re Guardianship of Olson*; No. 33383-3-III, *In re Guardianship of Fairbanks*; No. 33384-1-III, *In re Guardianship of Collier*; No. 33385-0-III, *In re Guardianship of Blair*; No. 33386-8-III, *In re Guardianship of Vogel*; No. 33387-6-III, *In re Guardianship of Campbell*; No. 33388-4-III, *In re Guardianship of Fenske*; No. 33389-2-III, *In re Guardianship of Sullivan*; No. 33390-6-III, *In re Guardianship of Higgins*; No. 33391-4-III, *In re Guardianship of Tuckerman*; No. 33392-2-III, *In re Guardianship of Wharton*; No. 33393-1-III, *In re Guardianship of Weiland*; No. 33394-9-III, *In re Guardianship of Vingo*; No. 33395-7-III, *In re Guardianship of Morales*; No. 33396-5-III, *In re Guardianship of Morales*; No. 33397-3-III, *In re Guardianship of Moore*; No. 33398-1-III, *In re Guardianship of*

*Stanich*; No. 33399-0-III, *In re Guardianship of Hopper*; No. 33400-7-III, *In re Guardianship of Taylor*; No. 33401-5-III, *In re Guardianship of Rosser*; No. 33402-3-III, *In re Guardianship of Reinhardt*; No. 33403-1-III, *In re Guardianship of Fry*; No. 33404-0-III, *In re Guardianship of Edgar*; No. 33405-8-III, *In re Guardianship of Pitner*; No. 33406-6-III, *In re Guardianship of Baker*; No. 33407-4-III, *In re Guardianship of Williams*; No. 33408-2-III, *In re Guardianship of Wells*; No. 33409-1-III, *In re Guardianship of Alden*; No. 33410-4-III, *In re Guardianship of Stephens*; No. 33411-2-III, *In re Guardianship of Torpey*; No. 33414-7-III, *In re Guardianship of Gehring*; No. 33444-9-III, *In re Guardianship of Brangwin*; No. 33445-7-III, *In re Guardianship of Anderson*; No. 33446-5-III, *In re Guardianship of Anderson*; No. 33447-3-III, *In re Guardianship of Baldwin*; No. 33448-1-III, *In re Guardianship of Baldwin*; No. 33449-0-III, *In re Guardianship of Blair-Robbins*; No. 33450-3-III, *In re Guardianship of Bloyed*; No. 33451-1-III, *In re Guardianship of Brady*; No. 33452-0-III, *In re Guardianship of Bowen*; No. 33453-8-III, *In re Guardianship of Claycomb*; No. 33454-6-III, *In re Guardianship of Dahl*; No. 33455-4-III, *In re Guardianship of Delorenzo*; No. 33456-2-III, *In re Guardianship of Demary*; No. 33457-1-III, *In re Guardianship of Desjardins*; No. 33458-9-III, *In re Guardianship of Eberhart*; No. 33459-7-III, *In re Guardianship of Eisenman*; No. 33460-1-III, *In re Guardianship of Foster*; No. 33461-9-III, *In re Guardianship of Futo*; No. 33462-7-III, *In re Guardianship of Garcia*; No. 33463-5-III, *In re Guardianship of Haliwell*; No. 33464-3-III, *In re Guardianship of Harrington*; No. 33465-1-III, *In re Guardianship of Hinds*; No. 33466-0-III, *In re Guardianship of House*; No. 33467-8-III, *In re Guardianship of Howard*; No. 33468-6-III, *In re Guardianship of Jenkins*; No. 33469-4-III, *In re Guardianship of Laird*; No. 33470-8-III, *In re Guardianship of Lee*; No. 33471-6-III, *In re Guardianship of Loss*; No. 33472-4-III, *In re Guardianship of Love*; No. 33473-2-III, *In re Guardianship of Mally*; No. 33474-1-III, *In re Guardianship of May*; No. 33475-9-III, *In re Guardianship of McKinsey*; No. 33476-7-III, *In re Guardianship of McLellan*; No. 33477-5-III, *In re Guardianship of McMorris*; No. 33478-3-III, *In re Guardianship of Melendrez*; No. 33479-1-III, *In re Guardianship of Melton*; No. 33480-5-III, *In re Guardianship of Miller*; No. 33481-3-III, *In re Guardianship of Milton*; No. 33482-1-III, *In re Guardianship of Mitchell*; No. 33483-0-III, *In re Guardianship of Morris*; No. 33484-8-III, *In re Guardianship of Naylor*; No. 33485-6-III, *In re Guardianship of Oppengaard*; No. 33486-4-III, *In re Guardianship of Palmer*; No. 33487-2-III, *In re Guardianship of Rice*; No. 33488-1-III, *In re Gurdianship of Rivero*; No. 33489-9-III, *In re Guardianship of Roberts*; No. 33490-2-III, *In re Guardianship of Seeman*; No. 33491-1-III, *In re Guardianship of Shaw*; No. 33492-9-III, *In re Guardianship of Slater*; No. 33493-7-III, *In re Guardianship of Smith*; No. 33494-5-III, *In re Guardianship of Boyd*; No. 33495-3-III, *In re Guardianship of Stephenson*; No.

No. 33356-6-III
*In re Guardianship of Holcomb*, et al.

SIDDOWAY, J. — After Lori Petersen, a certified professional guardian (CPG), received a one-year disciplinary suspension, the Spokane County Superior Court undertook judicial review not only of cases in which she served as guardian, but of cases assigned to a CPG agency (CPGA) with which she was associated. Following costly proceedings in which replacement guardians were appointed in every case, the court assessed costs of the procedure against her and the corporate operator of the agencies.

The costs were assessed without due process, including without affording the CPGA an opportunity to challenge facts outside the record on which assessment decisions were based. We reverse the money judgments only, and remand for further proceedings consistent with this opinion. We retain jurisdiction for one reason only: the administrative inconvenience to the courts and the parties that would be presented should the conduct of further hearings result in over 120 new appeals. Our retention of jurisdiction should not be viewed as reflecting any view of the merits or any belief that a further appeal is expected.

---

33496-1-III, *In re Guardianship of Sternberg*; No. 33497-0-III, *In re Guardianship of Stocker*; No. 33498-8-III, *In re Guardianship of Storrud*; No. 33499-6-III, *In re Guardianship of Tiffany*; No. 33500-3-III, *In re Guardianship of Underwood*; No. 33501-1-III, *In re Guardianship of White*; No. 33502-0-III, *In Guardianship of Withers*; No. 33503-8-III, *In re Guardianship of Baker*; No. 33504-6-III, *In re Guardianship of McCoy*; No. 33505-4-III, *In re Guardianship of McDirmid*; No. 33506-2-III, *In re Guardianship of Trimble*; No. 33507-1-III, *In re Guardianship of Zingale*; No. 33508-9-III, *In re Guardianship of Leach*; No. 33601-8-III, *In re Guardianship of Getchell*.

No. 33356-6-III
*In re Guardianship of Holcomb*, *et al*.


BACKGROUND OF PROCEEDINGS

Lori Petersen became a CPG in 2001. *See In re Disciplinary Proceeding Against Petersen*, 180 Wn.2d 768, 773, 329 P.3d 853 (2014). In April 2012, the Certified Professional Guardian Board served her with a complaint charging her with violating standards of practice. *Id.* at 774-75. The charges and Ms. Petersen's defense were presented to a hearing officer in October 2012. *Id.* at 775. He entered findings, conclusions, and a recommendation that Ms. Petersen be suspended from serving as a CPG for 1 year and monitored for 24 months thereafter. *Id.* at 779. The Board adopted the hearing officer's recommendations but reduced the costs he had recommended be imposed. *Id.*

The record and recommendation were submitted to the Washington Supreme Court for review. It questioned only the proportionality of the costs imposed by the Board. *Id.* After a remand in which the Board made a further substantial reduction in the costs imposed to $7,500.00, the court affirmed and adopted the Board's recommendation in an order dated March 13, 2015. During the almost three years of proceedings leading up to the March 2015 order, the Board did not impose an interim suspension on Ms. Petersen, which it was authorized to do if there was a substantial risk of injury to the

4

public.  *Petersen*, 180 Wn.2d at 789 (citing former DR[1] 519).

The Supreme Court's order directed that Ms. Petersen's suspension become effective on March 20, 2015.  In response to a motion to stay the suspension filed with the Supreme Court by Ms. Petersen on March 18, the court granted a stay to April 27, 2015, to allow her "to work with the Certified Professional Guardian Board to ensure proper representation of her clients and the transition of the representation of her clients to successor certified professional guardians."  Clerk's Papers (CP) at 67.

At the time of the Supreme Court's order, Ms. Petersen operated as a CPG doing business as Empire Care Services or Empire Care and Guardianship (Empire).  The Supreme Court's July 2014 decision characterized Empire as an agency that Ms. Petersen "owns and operates" and described it as "serv[ing] over 60 wards."  *Petersen*, 180 Wn.2d at 773.  By Ms. Petersen's count at the time, 37 of the wards she served were subject to guardianships ordered and being supervised by the Spokane County Superior Court.

At the time of the Supreme Court's order affirming her suspension, Ms. Petersen was also an employee of Hallmark Care Services, Inc. and served as a designated CPG for two CPGAs operated by Hallmark: Castlemark Guardianship and Trust (Castlemark),

---

[1] The Board's disciplinary rules (DR) are contained within the Certified Professional Guardianship Board's Program Regulations, available at https://www .courts.wa.gov/programs_orgs/guardian/?fa=guardian.display&fileName=rulesindex.  In the regulations presently appearing on the website, the Board's authority to impose an interim suspension where a respondent's continued practice as a CPG poses a substantial threat of serious harm to the public appears at DR 509.6.1.A.

and Eagle Guardianship and Professional Services (Eagle). If she were not replaced, Ms. Petersen's suspension as a CPG would cause Hallmark to be out of compliance with a Board regulation requiring CPGAs to have two designated CPGs.

On March 17, 2015, a Spokane County court commissioner wrote to Ms. Petersen at two business locations—one, Hallmark's; the other, Empire's—directing her to inform the court in writing of her plans for her caseload, given the impending March 20 effective date of her suspension. She was asked to deliver her answer by no later than 4:00 p.m. on March 19. An attachment to the letter listed well over 120 pending guardianships by case name, incapacitated person name, guardian, and standby guardian. Empire was the assigned guardian in 32 of the cases and Ms. Petersen was the assigned guardian in 5. In all of the other cases, the assigned guardian was Castlemark, Eagle, or Hallmark.

Ms. Petersen's lawyer responded to the court commissioner the next day, notifying her that a motion had been made to stay the Supreme Court's order to allow Ms. Petersen time to transition her clients. He pointed out that of the cases on the commissioner's list, only 37 were cases in which Ms. Petersen served as guardian in her own name or in her trade name, Empire, causing them to be directly affected by the suspension. As for the Castlemark and Eagle cases, he informed the commissioner that Ms. Petersen would cease working for Hallmark during the period of her suspension and that Hallmark was working to identify a new designated CPG to replace Ms. Petersen. He stated that he had

notified the Board of the change in agency status in light of Ms. Petersen's suspension and that Hallmark had 60 days to find a new CPG, citing Board DR 706.3.

Ms. Petersen's lawyer later filed a notice of appearance for Hallmark. Given the predominance of his advocacy for Hallmark in matters relevant to this appeal, we refer to him hereafter as Hallmark's lawyer, although he continues to represent Ms. Petersen.

According to a declaration Hallmark's lawyer later filed with the court, corporate actions were taken on April 1, 2015, by Hallmark's shareholder, directors and officers to address Ms. Petersen's impending suspension. Reportedly, Keri Sandifer was elected the sole director and officer of Hallmark and two individual CPGs in good standing, James Whiteley and Joan Shoemaker, provided written acceptances of their appointment as Hallmark's two designated CPGs on that date. The lawyer's declaration states, "After April 1, 2015, Hallmark Care Services, Inc. had on its board, an individual qualified pursuant to RCW 11.88.020, and had two designated CPGs, both in good standing with the CPG Board, making the Agency compliant pursuant to GR 23(d)(2)." CP at 105.[2]

On April 7, 2015, a judge of the Spokane County Superior Court wrote to Hallmark's counsel and expressed disagreement with his view that only Ms. Petersen's and Empire's cases were affected by Ms. Petersen's suspension. The letter stated that the

---

[2] The declaration also states that Ms. Sandifer was given a proxy by the company's sole shareholder, PJLA, Inc., but as discussed hereafter, rules adopted by the Washington Supreme Court do not treat ownership of the capital stock of a CPGA as relevant to certification.

appointment of successor guardians was at issue in all of Hallmark's cases as well,

explaining:

> Specifically, Hallmark/Castlemark/Eagle's ownership is in question. Despite inquiries by the Court on multiple occasions, ownership has always been stated as "confidential." The choice to leave this inquiry unanswered puts Ms. Petersen's association with any of those agencies into question. The Court will not appoint as a successor guardian any certified professional guardian associated with Hallmark or with entities falling under the Hallmark umbrella.

CP at 56.

## PROCEEDINGS

On the same day that the superior court judge informed Hallmark's counsel that all of its cases would be transitioned to a successor guardian, a second superior court judge signed an order appointing a special master "to oversee the transition to and appointment of successor guardians for incapacitated persons serviced by . . . Lori Petersen and the agencies of which she is a designated CPG or standby guardian." CP at 94. The order was uncaptioned other than to say, "In the Guardianship of: ____ An Incapacitated Person" and bore no case number. A copy of the order was mailed to Hallmark's lawyer.

In a contemporaneous letter, the first superior court judge wrote to persons serving as guardians ad litem (GAL) in Spokane County that the suspension of Ms. Petersen "affects 125 cases in Spokane County," causing it to appoint a special master "to oversee the transition of the 125 cases currently assigned to Ms. Petersen and/or agencies with which she is involved." CP at 58. It explained:

8

> The court will assign Guardians ad Litem to each case to investigate the appointment of a guardian, successor guardian and/or standby guardian. Of the 125 cases seven are already assigned to Mr. William Dodge to investigate specific complaints . . . .
>
> . . . Ms. Ana Kemmerer[3] will assign a group of cases to each of you so the work can begin. If you have a conflict in a particular case please file a motion and the Special Master will review it. If the Special Master concurs, Ms. Kemmerer will arrange a trade between two Guardians ad Litem to eliminate the conflict and keep the caseload balanced.
>
> Ms. Kemmerer cannot review each case to determine if it is county or private pay. At a minimum your reasonable fees will be covered at the county pay rate. Because generally the only issue in these cases will be appointment of a successor guardian and/or standby guardian, the maximum fee will be $500.00 without further court approval.

CP at 58-59.

On April 10, 2015, dozens of orders were entered appointing GALs and scheduling review hearings on an expedited basis for each guardianship in which Ms. Petersen, Empire, Castlemark, or Eagle served as guardian. Each order was captioned with multiple case names and numbers; generally with four. In each order, the court directed a given GAL to review court files and any other pertinent records and file a GAL report and successor guardian recommendation on the assigned cases with the court. Each order found good cause to shorten the period for filing the GAL reports from 15 days to 5 days before the scheduled hearing date. The order did not direct the GAL to

---

[3] Ms. Kemmerer served as Guardianship Monitoring Program Coordinator within the Spokane County Court Administrator's Office.

9

provide a copy of his or her report and recommendation to Ms. Petersen, Hallmark, or their lawyer.

Each order reiterated that the GAL was appointed initially at public expense and that Spokane County would not pay more than $500 in GAL fees without further court approval. Each contained the following additional language:

> Upon the hearing to appoint a successor guardian and/or standby guardian, the Court may assess all Guardian ad Litem fees as costs against Certified Professional Guardian, Lori Petersen, CPG #9713.

*See* CP at 178-647. The orders were e-mailed to Hallmark's lawyer on April 10 and were mailed to him on the following Monday, April 13.

On April 16, Ms. Kemmerer forwarded a follow-up letter to the GALs from the second superior court judge. It informed the GALs that:

> No certified Professional Guardian or agency affiliated with Ms. Lori Petersen should be appointed as Guardian or Standby Guardian. That therefore excludes any CPG affiliated with the Hallmark, Castlemark, and Eagle agencies, including but not limited to Joan Shoemaker and James Whiteley, from being appointed.

CP at 76. On April 19, Ms. Shoemaker resigned as a designated CPG for Hallmark, reportedly because she received a telephone call from an employee of the Administrative Office of the Courts informing her that if she continued as a CPG for Hallmark, she would lose all her guardianship cases. Hallmark's lawyer later represented to the court that Mr. Whiteley had received a similar call.

On April 17, 2015, Hallmark's lawyer filed a motion for reconsideration of the order appointing the special master, specifically challenging its directive to transition guardianship cases to guardians other than Hallmark dba Castlemark and Eagle. Hallmark posed a number of questions about events leading to the court's order and challenged the court's jurisdiction to take actions against Hallmark that it characterized as disciplinary, and therefore the exclusive province of the Board.

The court heard argument of the motion for reconsideration on May 15, 2015, and announced its decision a couple of days later. In orally announcing its decision, the court stated that in appointing the special master it had relied on its authority under RCW 11.88.120(1) and (4) and that the order appointing the special master did only two things: appointed a special master and ordered Ms. Petersen to post a surety bond (the court granted Ms. Petersen's challenge to the surety bond requirement). The court stated, "The order that I signed does not remove Hallmark from any case nor does it order the appointment of a guardian in any case." Report of Proceedings (RP) (May 18, 2015) at 4.

Later, however, the court stated:

> Ms. Petersen is not now listed as a director or officer of the agency but there are concerns about ownership or other positions within the agency. This is important and necessary information because clearly the CPG Board and Supreme Court did not want Ms. Petersen, who has been found to have committed professional misconduct, involved in any guardianship actions.
> [Hallmark's lawyer] at argument noted there had been a change in directors and officers of the agency and said there was quote, no possibility

11

> of outside influence in the matter, closed quote. That's the heart of the issue in these cases completely. While Ms. Petersen may no longer be employed as a CPG with Hallmark or serving as an officer or director, there is a very valid concern based upon past history and lack of full disclosure, that she continues to be connected in some other way and still has access to and involvement with these vulnerable IPs. Having not received, even to this day, some positive affirmation from Hallmark that Ms. Petersen is no longer involved in any way or benefiting financially at all from any guardianship matters, this Court is not inclined to allow those agencies to be considered as guardian or standby guardian in these matters.

*Id.* at 8-9. A written order denying the motion for reconsideration was later entered and identified only the respects in which the motion was granted and denied, without making findings or stating reasons.

Meanwhile, the review hearings had begun on May 4, 2015, and they continued through June 4, 2015, before two superior court commissioners. Counsel for Hallmark was present for each of the review hearings. At one of the initial hearings, he challenged the superior court's jurisdiction, its authority to remove Hallmark, and the process it had used and was using to remove Hallmark and Ms. Petersen. Hallmark also filed a response and objection to the order appointing the guardian ad litem in three of the cause numbers, and it renewed that objection by reference at most of the hearings.

At each hearing, the GAL summarized his or her report and recommended a successor GAL. At the first hearing on May 4, Hallmark's lawyer indicated he had not yet received copies of any GAL reports. The court responded that it would have the GALs provide a copy of the reports as they went through the process. At oral argument

12

No. 33356-6-III
*In re Guardianship of Holcomb*, et al.

of this appeal, Hallmark's lawyer stated that he never received copies of the GAL reports in advance of the subject hearings, but he was sometimes provided with a copy of the report at the hearing itself. *See* Wash. Ct. App. oral argument, *In re Guardianship of Holcomb*, No. 33356-6-III (May 3, 2018) at 6 min., 41 sec. through 7 min., 17 sec. (available at http://www.courts.wa.gov/appellate_trial_courts/appellateDockets /index.cfm?fa=appellateDockets.showDateList&courtId=a03&archive=y).

Although some of the GALs did not report any concerns about the care provided by Ms. Petersen, Empire, Castlemark, or Eagle, a number did. Among concerns expressed in individual cases were

- mismanagement of trust funds;
- charging excessive or improper guardianship fees for clients with limited funds;
- providing insufficient personal allowance to the incapacitated person;
- failure to perform visits of the incapacitated person;
- failure to file periodic care plans or status reports;
- filing falsified or improper periodic care plan reports;
- failing to list a current address for the incapacitated person in the guardianship file;
- improper care; and
- complaints from caregivers concerning lack of communications from the guardian.

Some of these concerns were raised by the court and the GALs' review of the guardianship files, and some were raised by the caretakers or family members of the incapacitated person.

13

None of the GALs sought appointment of a successor CPG because of a concern
that Ms. Petersen might exercise control over Castlemark or Eagle or benefit financially
from its operations during the period of her suspension. None contended that she had
been insufficiently forthcoming about her role at Hallmark or that Hallmark was in chaos.
The commissioners sometimes explained their appointment decisions or responded to
Hallmark's procedural objections by referring to these matters, but it was not based on
any evidence presented by GALs during the review hearings.[4]

The amount of requested GAL fees was discussed on the record at some of the
hearings, but there were many hearings where the amount of fees requested was never
discussed. While both court commissioners allowed GALs to present fee requests at the
review hearings, both stated at various times that the court was not signing on the fees at
that time. *See* RP (May 7, 2015) at 49-50, 82; RP Supp. (May 4, 2015) at 13-14, (May
14, 2015) at 250. Instead, the commissioners repeatedly stated during review hearings
that they were reserving the issue of reimbursement to Spokane County for the approved
GAL fees pending further court review. Each order appointing a successor guardian also

---

[4] A declaration of Ms. Kemmerer containing some of this information had been
filed in opposition to Hallmark's and Ms. Peterson's motion for reconsideration of the
order appointing a special master but it was not a part of the evidence presented in the
review hearings.

stated that the court was reserving the issue of reimbursement pending further court review.[5]

A week following the conclusion of the review hearings, and without further notice or proceedings, the commissioners began entering judgments assessing GAL fees against Hallmark or Lori Petersen/Empire in all of the cases in which the incapacitated person lacked assets to pay. Each judgment indicated that the court found that the GAL fees incurred were reasonable and that "[t]he GAL investigation was necessitated by the suspension of Lori Petersen as a CPG in this matter and her association with related agencies." CP at 3175-4364. On the second page of each judgment entered against Hallmark, the court further found that:

> [A]lthough the agency in this case is not one in which Lori Peterson is the designated CPG, it has failed to disclose the interest that Ms. Peterson has in the agency and the degree of control that she has over the agency despite the requests of the court. Ms. Peterson has also served as the designated CPG for this agency and her activities were not overseen by the agency appropriately and as a result she was suspended. Furthermore, the agency has been in chaos with rapidly changing CPG designations. There have been numerous complaints from IPs, caregivers and others about lack of contact, lack of response to concerns raised about care and in some cases complaints about financial improprieties. The court has seen many instances of inaccurate and outdated information provided to it in annual reports. These acts and/or omissions have resulted in breaches of the fiduciary duty that the guardian owes to its IPs. Effective May 18, 2015, the agency, because of the recent resignation of one of the designated CPGs

---

[5] In some cases this language was included in a separate addendum order entered at the same time as the order appointing guardian, rather than in the order appointing guardian.

15

> will not have the requisite two CPGs to conduct business and effective June 30, 2015, the resignation of the other CPG will mean that it will have no CPGs to conduct business and thus it does not appear that the agency can provide the assurance of viability beyond that date. For all these reasons, and based upon additional findings of the court as articulated on the record in these related proceedings and incorporated by reference herein, the CPG agency is presently unsuitable to be appointed as a successor guardian and that has necessitated the need of the court to appoint a GAL to investigate and recommend a successor guardian to insure continuity of care for the incapacitated persons under its jurisdiction.

*Id.* at 4140. Upon entry, copies of the money judgments were served on Hallmark's attorney. Hallmark and Ms. Petersen appeal.

## ANALYSIS

### *Issues on appeal and motion to strike*

Hallmark and Ms. Petersen initially appealed three orders in each of more than 120 guardianship cases: the order appointing the special master; the order removing appellants as guardians and appointing a successor guardian; and the judgment assessing GAL fees against one of them. We consolidated the cases for appeal. The Spokane County Guardianship Monitoring Program (GM Program), a program within the county's superior court administrator's office, sought and was granted special amicus status to respond to Hallmark's pleadings on appeal.

In response to this court's motion to determine appealability, the parties briefed and our court commissioner heard argument on whether Ms. Petersen and Hallmark had standing to appeal their removal as guardians. Finding that Ms. Petersen and Hallmark

16

were not aggrieved parties with respect to the orders appointing a special master and removing them as guardians, our commissioner dismissed the appeal of those categories of orders, leaving the judgments assessing GAL fees as the sole subject matter of this appeal. Commissioner's Ruling, *In re Guardianship of Holcomb*, No. 33356-6-III (Wash. Ct. App. Aug. 26, 2015) at 22-23. Hallmark and Ms. Petersen did not move to modify the commissioner's ruling.

As a threshold matter, the GM Program asks us to strike portions of Hallmark's and Ms. Petersen's opening brief,[6] which it contends violates our commissioner's prior orders as well as provisions of the Rules on Appeal. The opening brief does include material that our commissioner deemed relevant only to dismissed matters, but with the benefit of hindsight, background on Hallmark's and Ms. Petersen's objections to the procedure followed in the superior court proves to be relevant. Hallmark and Ms. Petersen evidently foresaw that the superior court's authority to assess GAL fees against them would be defended on the basis that all actions taken in response to Ms. Petersen's suspension were an "emergent necessity," as the GM Program argues on appeal. Br. of Amicus Curiae at 12. Hallmark's and Ms. Petersen's objections to the procedure in the trial court calls into question that defense of the process.

---

[6] Hallmark's and Ms. Petersen's operative opening brief is their second. They were ordered by our court commissioner to remove portions of their first opening brief related to matters that were dismissed.

17

The GM Program's argument that Hallmark and Ms. Petersen violated the Rules of Appellate Procedure by failing to cite to all relevant portions of the record supporting their assertions of fact is also true. But the same can be said for some statements of fact in the GM Program's brief. We recognize that an appeal that involves separate submissions and proceedings in over 120 cases makes complete compliance with RAP 10.3(a)(5) and 10.4(f) onerous and perhaps prohibitively expensive. Both parties did a sufficient job of providing record citations for important and contested matters. Neither parties' briefing has hampered the work of the court.

We turn to the dispositive issue that remains before us following our commissioner's unappealed order as to the scope of the appeal: Whether the superior court violated CR 54(f)(2) and Hallmark's and Ms. Petersen's due process rights when it filed judgments requiring Ms. Petersen and Hallmark to reimburse Spokane County for the GAL fees incurred in each of the cases.

*Violation of CR 54(f)(2) and denial of due process*

Hallmark and Ms. Petersen argue that the money judgments entered against them violated CR 54(f)(2), which requires five days' notice of presentation of a judgment. They also allege a violation of due process, where the court commissioners consistently represented that the issue of assessment of the fees against Ms. Petersen was being reserved, and Hallmark never received notice that assessment of fees against it was even

being considered. At oral argument of the appeal, the GM Program characterized repeated statements by the commissioners that the cost assessment issue was being reserved as equivalent to the court taking a disputed matter under advisement. We disagree. The implication of the commissioners' statements was that an assessment of fees against Ms. Petersen, if it were to be considered at all, would be the subject matter of a future hearing. She and Hallmark understandably did not address the issue of fee assessment at the review hearings.

Under RAP 2.5(a), a party may raise a claim of "manifest error affecting a constitutional right" for the first time on appeal. "It is consistent with RAP 2.5(a) for a party to raise the issue of denial of procedural due process in a civil case at the appellate level for the first time." *Conner v. Universal Utils.*, 105 Wn.2d 168, 171, 712 P.2d 849 (1986) (citing *Esmieu v. Schrag*, 88 Wn.2d 490, 497, 563 P.2d 203 (1977)). The due process challenge is properly before us.

A party is also able to challenge a judgment entered in violation of CR 54(f)(2) for the first time on appeal. Failure to comply with the notice requirements of CR 54(f)(2) generally renders the trial court's entry of judgment void; while the judgment will not be found invalid if the complaining party is not prejudiced, a party *is* prejudiced if it is not allowed to appeal. *See Burton v. Ascol*, 105 Wn.2d 344, 352, 715 P.2d 110 (1986) (no prejudice shown when party was allowed to appeal).

19

The GM Program argues that the superior court was not required to comply with CR 54(f)(2) because guardianships are special proceedings for purposes of CR 81(a). Assuming (though not deciding) that this is so, CR 81(a) provides that statutes applicable to special proceedings supersede the civil rules only where they provide for inconsistent procedure. Statutes governing guardianship proceedings do not dictate a procedure for entering a money judgment imposing fees that is inconsistent with the procedure required by CR 54(f)(2).

Because entry of the money judgments violated both CR 54(f)(2) and Ms. Petersen's and Hallmark's right to due process, they are reversed.

*Procedure on remand*

Because our commissioner has dismissed Ms. Petersen's and Hallmark's challenges to the orders removing her and Hallmark's agencies as guardians, we write further to make clear that in any future proceedings, they are free to challenge the assessment of GAL fees (but not the orders removing them as guardians) on the basis that the replacement process followed by the court was not necessary.

It appears to be the case that in taking action in proceedings below some, and perhaps all, of the judicial officers involved were privy to information obtained ex parte from persons associated with the GM Program. As explained in *Sherman v. State*, 128

20

Wn.2d 164, 204-05, 905 P.2d 355 (1995), reliance on ex parte information, however well intentioned, is improper:

> Canon 3 of the CJC, which requires judges to perform the duties of their offices impartially and diligently, provides in relevant part:
>
> > Judges should accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law, and, except as authorized by law, neither *initiate* nor consider *ex parte* or other communications concerning a pending or impending proceeding. . . .
>
> CJC Canon 3(A)(4) (1994) (emphasis added). As the comment to Canon 3 explains, this prohibition against ex parte communications includes contacting neutral third parties about a pending case:
>
> > The proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and *other persons who are not participants in the proceeding*, except to the limited extent permitted. . . .
>
> CJC Canon 3(A)(4) cmt. (1994) (emphasis added).

*Id.*

It appears that some of the information obtained ex parte led to the conclusion by the judicial officers that no CPG or CPGA affiliated with Ms. Petersen or Hallmark could be appointed to serve as guardian. The Supreme Court's order and its rules do not support that conclusion.

RCW 11.88.120(1) addresses a court's authority to make changes to a guardianship after it is established, and includes the court's authority to replace a guardian, on the court's own motion, "upon the death of the guardian . . . or for other good reason." Washington cases hold that under a similarly-worded former law, "the

court always has power, under proper circumstances, to remove a guardian, but it may

not act arbitrarily." *In re Guardianship of Hemrich*, 187 Wash. 21, 26, 59 P.2d 748

(1936) (applying Rem. Rev. Stat. § 1579 (1932), which empowered courts to remove

guardians "for good and sufficient reasons") (citing *In re Estate of Shapiro*, 131 Wash.

653, 230 P. 627 (1924); *In re Guardianship of Dodson*, 135 Wash. 625, 238 P. 610

(1925)).

Under RCW 11.88.090(10), the fees of a GAL "shall be charged to the

incapacitated person unless the court finds that such payment would result in substantial

hardship upon such person, in which case the county shall be responsible for such costs."

This charging language is subject to the proviso that "the court may charge such fee to

the petitioner, the alleged incapacitated person, or any person who has appeared in the

action; or may allocate the fee, as it deems just." *Id.*

Guardianships are equitable creations of the courts and it is the Washington

Supreme Court that holds the authority to regulate the certification of professional

guardians. *Petersen*, 180 Wn.2d at 781-82. It has done so in GR 23, establishing the

framework and delegating some regulatory and rulemaking tasks to the Board. *Id.* at 782.

Relevant here, the Supreme Court has established the requirements that individuals and

agencies must meet to apply to serve as CPGs or CPGAs. GR 23(d). Although the

Board processes applications for certification and makes recommendations to the Supreme Court, it is ultimately the court that orders certification. GR 23(c)(2)(i), (v).

The Supreme Court's requirements for an agency wishing to be certified as a CPGA include a requirement that its officers and directors all meet the qualifications of RCW 11.88.020 for guardians, that it have two designated CPGs, and that it provide proof of its financial responsibility. GR 23(d)(2), (5). No requirement limits who can own the capital stock of a CPGA and the rule does not identify any ramification to an agency if one of its CPGs is suspended, other than the requirement that it have two CPGs in place. Board DR 706.3 provides that "[i]f a change in circumstances results in an agency having only one designated guardian, the agency shall notify the Board within five (5) calendar days of the change in circumstances" and "shall have sixty (60) calendar days from the date the agency is no longer in compliance with GR 23 to add a designated guardian to the agency."

The fact that the Supreme Court has not required that the capital stock of a CPGA be owned by only CPGs in good standing makes sense. CPGs may have a significant capital investment in a CPGA through which they operate, and may have coworkers who depend on the business's continued operation for their livelihood. Even if a CPG facing suspension does not have a large sunk investment in a CPGA's assets, she may be individually responsible, as a guarantor or otherwise, for ongoing real estate, equipment,

and loan obligations. Obviously she must scrupulously abide by an order suspending her, and the suspension alone will likely have significant financial ramifications. But nothing in GR 23 suggests that in addition to suffering the suspension, a CPG should lose her entire investment in a CPGA or that the CPG's coworkers should all be thrown out of work.

The Supreme Court's order in Ms. Petersen's case provides only that "Lori A. Petersen is suspended for a period of one year," that "[f]ollowing the end of the one year suspension, she shall be monitored for a 24 month period," that "[t]he monitoring shall be at Lori A. Petersen's expense," and that "Lori A. Petersen shall pay costs to the Board in the amount of $7,500.00." CP at 1881. It does not state or imply that anyone affiliated with Ms. Petersen must suffer suspension with her.

Evidence presented in future proceedings may or may not support the guardian replacement procedure followed by the court and an assessment of fees against Hallmark or Ms. Petersen. We do not prejudge that issue, but want to be clear that our commissioner's decision that the guardian replacement decisions were not before us on appeal does not foreclose Hallmark's challenge to fee assessments based on what it claims was an unnecessary guardian removal procedure.

We reverse the money judgments only, and remand for further proceedings consistent with this opinion. We retain jurisdiction to avoid the administrative

24

No. 33356-6-III
*In re Guardianship of Holcomb, et al.*

inconvenience to the courts and the parties that would be presented should the conduct of

further hearings result in over 120 new appeals.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Fearing, J.

25